**Reversed and Rendered and Opinion filed May 30, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-12-00581-CV

## THE UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON, Appellant

## V.

## KAI HUI QI, Appellee

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 11CV0043**

## O P I N I O N

The University of Texas Medical Branch at Galveston ("UTMB") appeals an order denying its plea to the jurisdiction. We reverse and render judgment dismissing Kai Hui Qi's suit against UTMB for lack of jurisdiction.

### Background

Appellee Kai Hui Qi sued UTMB, Virginia Rauth, M.D., and Julie Griffice, R.N. on January 11, 2011, after delivering a stillborn male child. In her original petition, Qi alleged that she had an "uncomplicated pregnancy until January 12,

2009, when she presented to Defendants with a blood pressure of 146/83, an interval 8 pound weight gain, and a urine dipstick test which returned trace." Qi alleged that she called into UTMB's labor and delivery triage unit on January 18, 2009, complaining of vaginal bleeding and a blood pressure of 140/90. The next day, Qi went to UTMB and complained of vaginal bleeding, headache, and elevated blood pressure. "In triage, she had a blood pressure of 148/101 and was noted to have an intrauterine fetal demise and oligo/anhydramnios." Qi alleged that the attending physician induced her labor, and she delivered a stillborn child on January 20, 2009. Qi alleged that Rauth and Griffice were negligent by failing to "diagnose preeclampsia" and by failing to admit Qi for elevated blood pressure. She alleged causes of action for negligence and gross negligence.

UTMB and Griffice filed an original answer, a plea to the jurisdiction, and a motion to dismiss on February 14, 2011, arguing that Qi's suit should be dismissed for lack of jurisdiction because UTMB has sovereign immunity from suit and liability. They contend that Qi's petition failed to allege "adequate grounds or facts to establish a waiver of sovereign immunity under the Texas Tort Claims Act or any other statute or constitutional provision." On the same day, UTMB filed a motion to dismiss Rauth and Griffice from the suit pursuant to Texas Practice and Remedies Code section 101.106(e).

Qi filed an agreed motion to dismiss Rauth and Griffice from the suit on March 3, 2011. The trial court granted the agreed motion on March 4, 2011, and dismissed Rauth and Griffice from Qi's suit.

Qi filed a first amended petition on March 17, 2011, alleging that UTMB's "employees were negligent in the use of the blood pressure cuffs/testing equipment and urine test strips, by improperly reading and interpreting the results produced by the testing equipment" which "led directly to [Qi]'s preeclampsia, which directly

2

resulted in the death of [Qi]'s unborn child and to the injuries" Qi suffered. "Had [UTMB]'s employees properly read and interpreted those test results, a standard work-up would have been ordered, including, serial blood pressures, a 24-hour urine collection, and laboratory tests, and if any of these were persistently positive, a fetal ultrasound to screen for intrauterine growth restriction." Qi alleged that this is "a claim brought under the Texas Tort Claims Act," and further stated in her petition that UTMB's "employees were negligent and proximately cause[d] [Qi]'s injuries as follows:"

> a. In the use of the blood pressure cuffs/testing equipment and urine test strips.
>
> b. In deviating from the standard of care for the treatment of high blood pressure and preeclampsia;
>
> c. In failing to properly and timely diagnose high blood pressure and preeclampsia;
>
> d. In failing to counsel Plaintiff on the possibility of developing preeclampsia and the symptoms to watch for.
>
> c. In failing to properly treat Plaintiff's condition;
>
> d. In failing to admit Plaintiff to the hospital for observation;
>
> g. In failing to order the appropriate tests;
>
> h. In failing to refer Plaintiff to a specialist or a physician qualified to confirm diagnosis and treat Plaintiff, or to consult with such a specialist or physician concerning Plaintiff's condition; and
>
> The employees' negligence, and the resulting injuries suffered by [Qi], was the direct result of the negligent use of the blood pressure cuffs/testing equipment and urine test strips, items of tangible personal property. More specifically, [UTMB]'s employees negligently used the blood pressure cuffs/testing equipment and urine test strips, by improperly reading and interpreting the results produced by that equipment.
>
> \*   \*   \*
>
> As a direct and proximate result of [UTMB]'s employees' negligent

3

use of tangible personal property, [Qi]'s son was stillborn, and [Qi] has been caused to suffer severe mental pain, anguish, grief, and sorrow . . . loss of society, companionship, and affection of her son . . . severe injuries, mental and physical pain and suffering, mental anguish, and physical impairment.

UTMB filed a supplement to its plea to the jurisdiction and motion to dismiss with prejudice on May 18, 2012, to which it attached Qi's interrogatory responses and the deposition testimony of Qi's expert witness, Aaron Caughey, M.D., Ph.D.

In its plea, UTMB argued that Qi's claim does not fall within one of the categories to which waiver of sovereign immunity applies under the Texas Tort Claims Act because Qi's "allegations do not assert that [UTMB] negligently used the alleged tangible personal property and thus caused [Qi's] injury; but, [Qi] is complaining that [UTMB] improperly read and interpreted the information produced by the alleged tangible personal property." UTMB argued that "Dr. Caughey's criticism is not that the use of the alleged tangible personal property caused the preeclampsia in [Qi]; but, that [UTMB] failed to use the tangible personal property in order to diagnose the existence of preeclampsia in [Qi]." UTMB also contended that Qi's other allegations of negligent acts by UTMB "are not sufficient to allege a waiver of sovereign immunity under the Texas Tort Claims Act as they do not allege the use of tangible personal property. Instead, the allegations complain of the medical judgment exercised by employees of [UTMB]. Alleged errors in medical judgment, absent the negligent use of tangible personal property, do not give rise to a waiver of sovereign immunity under the Texas Tort Claims Act."

Dr. Caughey testified in his deposition that preeclampsia is a "disease that's specific to pregnancy, which we believe is caused by an [sic] maternal immune response, we say alloimmune response, allo meaning other, response to other, which is a response to actually the fetus, but specifically the placenta and

4

antibodies on the placenta." He testified that preeclampsia "encompasses a triumvirate of elevated blood pressure, elevated protein in the urine," and "usually nondependent edema." To diagnose preeclampsia, there must be (1) two elevated blood pressures, "either a systolic greater than 140 or a diastolic greater than 90," at least six hours apart; and (2) elevated protein in the urine of 300 milligram after a 24 hour urine collection.

Dr. Caughey made the following points during his testimony:

- Qi was at higher risk for developing preeclampsia because she had an in vitro fertilization pregnancy; therefore, it was necessary to diagnose whether she had gestational hypertension, mild preeclampsia, or severe preeclampsia.

- The blood pressure readings on January 12 were not sufficient by themselves to diagnose preeclampsia.

- The tools that were available on January 12 to diagnose Qi included blood tests; a 24-hour urine collection to measure protein levels in the urine; blood pressure readings taken at least six hours apart; and an obstetric ultrasound to evaluate fetal growth. These tests could have been performed on January 12 or within 24 hours.

- Qi's treatment when she presented with elevated blood pressure on January 12 fell below the standard of care because these available diagnostic tools were not used to determine whether she had gestational hypertension or preeclampsia.

- The two blood pressure readings taken on January 12 were not performed improperly. Another blood pressure reading should have been taken six hours later.

5

- Dr. Caughey answered "no" to questions asking whether he had seen anything in the records leading to a conclusion that Dr. Rauth and Nurse Griffice were negligent in the way they used the blood pressure cuff and urine test strips.

- No evidence suggests that the blood pressure readings were recorded improperly.

- Dr. Caughey does not dispute the accuracy of the dipstick test result that came back trace positive, and does not believe the dipstick test was performed in an inappropriate manner. Making a definitive diagnosis requires a 24-hour urine collection.

Dr. Caughey stated that if Qi had been "diagnosed appropriately" with "preeclampsia on January 12th, 2009, then . . . the intrauterine fetal demise could have been prevented by earlier delivery and if delivered, the infant would have survived more likely than not." The placental abruption "seems to be the cause in this case of the stillbirth, and so that would be then caused by preeclampsia." "Thus, the clinicians who saw Ms. Qi on January 12th, 2009 violated the standard of care by not further evaluating her for gestational hypertension/preeclampsia."

Qi filed a response to UTMB's supplement to the plea to the jurisdiction and motion to dismiss with prejudice on June 8, 2012. In her motion, Qi argued that improperly reading and interpreting the results produced by medical testing equipment constitutes a use of tangible personal property and a waiver of governmental immunity.

The trial court held a hearing on UTMB's plea to the jurisdiction and motion to dismiss on June 11, 2012. On the same day, the trial court signed an order denying UTMB's plea to the jurisdiction and motion to dismiss with prejudice.

6

UTMB timely filed this interlocutory appeal on June 21, 2012.[1]

## Standard of Review

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cnty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Immunity from suit defeats a trial court's subject matter jurisdiction and thus is properly asserted in a plea to the jurisdiction. *Tex. Dep't of Transp. v. Jones*, 8 S.W.3d 636, 637 (Tex. 1999). A plea questioning the trial court's jurisdiction raises a question of law that is reviewed *de novo*. *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007).

When reviewing whether a plea was properly granted, we first look to the pleadings to determine if jurisdiction is proper. *City of Waco v. Kirwan*, 298 S.W.3d 618, 621 (Tex. 2009). We construe the pleadings liberally in favor of the plaintiff and look to the pleader's intent. *Id*. If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiff should be afforded the opportunity to amend. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226-27 (Tex. 2004). If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id*. at 227.

If a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, even where those facts may implicate the merits of

---

[1] *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (Vernon Supp. 2012) (permitting interlocutory appeal from an order granting or denying government's plea to the jurisdiction).

the cause of action. *Kirwan*, 298 S.W.3d at 622. If the evidence creates a fact issue as to the jurisdictional issue, then it is for the factfinder to decide. *Id.* If the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* In considering this evidence, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Id.*

## Analysis

In one issue, UTMB argues that the trial court erred by denying its plea to the jurisdiction and motion to dismiss with prejudice "as there is not a waiver of sovereign immunity under the Texas Tort Claims Act as the evidence conclusively established that the appellee's alleged injuries and damages were not proximately caused by the negligent use of tangible personal property."

In Texas, sovereign immunity deprives a trial court of subject matter jurisdiction for lawsuits in which governmental units have been sued unless the state consents to suit. *Miranda*, 133 S.W.3d at 224. UTMB is a "governmental unit." *Robinson v. Univ. of Tex. Med. Branch*, 171 S.W.3d 365, 368 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *Noah v. Univ. of Tex. Med. Branch*, 176 S.W.3d 350, 355 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). The Texas Tort Claims Act ("TTCA") provides a limited waiver of sovereign immunity. *Miranda*, 133 S.W.3d at 224; *see* Tex. Civ. Prac. & Rem. Code Ann. §§ 101.001–.109. (Vernon 2011 & Supp. 2012). Section 101.021 provides:

> A governmental unit in the state is liable for:
>
> > (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
> >
> > > (A) the property damage, personal injury, or death arises

8

from the operation or use of a motor-driven vehicle or motor-driven equipment; and

(B) the employee would be personally liable to the claimant according to Texas law; and

(2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem. Code Ann. § 101.021.

UTMB contends that the trial court should have granted its plea to the jurisdiction and dismissed Qi's suit because (1) UTMB employees did not negligently use tangible personal property, *i.e.*, blood pressure cuffs/testing equipment and urine test strips; (2) tangible personal property did not cause Qi injury because she already suffered from preeclampsia when she came to the hospital; (3) Qi's allegation that UTMB employees improperly read and interpreted test results does not waive sovereign immunity under the Texas Tort Claims Act "as there is not a waiver of sovereign immunity for the use or misuse of information;" (4) the true substance of Qi's "complaint is not that she was injured by the negligent use of tangible personal property; but, instead, that she was harmed by an error in medical judgment and/or a failure to diagnose preeclampsia;" and (5) the remaining allegations of negligence in Qi's petition are "not sufficient to allege a waiver of sovereign immunity under the Texas Tort Claims Act as they do not allege a condition or use of tangible personal property."

Qi responds that the trial court correctly found a waiver of sovereign immunity under the Texas Tort Claims Act and denied UTMB's plea to the jurisdiction and motion to dismiss because (1) the improper reading and interpreting of results produced by medical testing equipment constitutes a use of tangible personal property, and a waiver of governmental immunity under *Salcedo*

9

*v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983), *Texas Tech University Health Sciences Center v. Lucero*, 234 S.W.3d 158 (Tex. App.—El Paso 2007, pet. denied), and *University of Texas Medical Branch Hospital v. Hardy*, 2 S.W.3d 607 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); (2) Dr. Caughey's expert report and deposition testimony "support the claim that had the doctors at UTMB properly read and interpreted the results of the blood pressure and urine protein tests, [Qi] would have been admitted for further testing," she would have been diagnosed with preeclampsia, delivery of the baby would have been induced, and the baby would have more likely than not survived; and (3) tangible personal property need not actually cause the stillbirth and injury but only need to be a substantial factor in bringing about the stillbirth and injury to establish a waiver of sovereign immunity under the Texas Tort Claims Act.

We conclude that Qi's suit does not invoke the limited waiver of sovereign immunity found in the Texas Tort Claims Act because Qi's allegations do not meet the Act's requirement that the use of tangible personal property caused the stillbirth and injury, and the substance of Qi's claim is that UTMB's employees failed to timely diagnose and treat Qi for preeclampsia and induce delivery of her baby.

## I.    Use of Property did not Cause the Injury

To state a claim that falls within the limited waiver of immunity under the TTCA, Qi must allege that the use of tangible personal property proximately caused personal injury or death. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.021(2). "Use" is defined as "to put or to bring into action or service; to employ for or apply to give a purpose." *Tex. Dep't of Crim. Justice v. Miller*, 51 S.W.3d 583, 588 (Tex. 2001). However, the basic purpose of section 101.021 is to waive immunity "only to a limited degree." *Dallas Cnty. Mental Health & Mental*

10

*Retardation v. Bossley*, 968 S.W.2d 339, 343 (Tex. 1998). Thus, for a waiver under subsection (2) to apply, the plaintiff's injury "must be proximately caused by the condition or use of tangible property." *Id.* "The requirement of causation is more than mere involvement," and "[p]roperty does not cause injury if it does no more than furnish the condition that makes the injury possible." *Id.*; *see Miller*, 51 S.W.3d at 588. Instead, the property must be the instrumentality of the harm. *Tex. Tech Univ. Health Sci. Ctr. v. Jackson*, 354 S.W.3d 879, 884 (Tex. App.—El Paso 2011, no pet.); *Robinson*, 171 S.W.3d at 369; *see Bossley*, 968 S.W.2d at 342.[2]

Qi's reliance on *Salcedo*, *Lucero,* and *Hardy* is misplaced in light of the case law's development after *Salcedo*.

In *Salcedo*, the decedent was examined for severe chest pains. 659 S.W.2d at 31. An electrocardiogram test conducted in the emergency room showed a classic heart attack pattern, but Salcedo was released; he later died of a heart attack. *Id.* His widow sued and alleged that the hospital was liable for his death under the TTCA based on misuse of the electrocardiogram equipment "by improperly reading and interpreting the electrocardiogram graphs and charts produced by the equipment." *Id.* at 32. The trial court dismissed her case for failure to state a claim under the TTCA, and the court of appeals affirmed. *Id.* at 31.

The supreme court reversed, holding that "an allegation of defective or inadequate tangible property is not necessary to state a cause of action under the

---

[2] A panel majority of this court recently held that the "use" of tangible property must be negligent in order for the waiver of sovereign immunity to be applicable. *Univ. of Tex. Health Sci. Ctr. v. DeSoto*, No. 14-12-00620-CV, 2013 WL 1169126 at *4-6 (Tex. App.—Houston [14th Dist.] March 21, 2013, no pet. h.). Justice McCally dissented. *Id.* at *6-8. We need not address negligent "use" of tangible property in order to resolve this appeal because there is no "use" of tangible property in the statutory sense – negligent or otherwise – at issue in this case. Instead, this case focuses on a different inquiry involving alleged misuse of intangible information.

Act if 'some use' of the property, rather than 'some condition' of the property, is alleged to be a contributing factor to the injury." *Id*. at 32. It determined that the widow's allegation that the hospital was liable under the TTCA for misuse in improperly reading and interpreting the electrocardiogram graphs stated a claim. *Id*. at 31, 33. The court held that "[r]eading and interpreting are purposes for which an electrocardiograph is used or employed in diagnosing" a heart attack, and that therefore Salcedo's widow "has alleged her loss was proximately caused by the negligence of the hospital district's employees in the use of tangible property." To reach this holding, the supreme court construed language in an earlier version of the TTCA — specifically, the word "some" appearing before "condition" and "use," and the provision requiring liberal construction. *Id*. at 32, 33.

When *Salcedo* was decided in 1983, the TTCA provided for a waiver of sovereign immunity for death or personal injuries caused from "some" condition or "some" use of tangible property. *Redden v. Denton Cnty.*, 335 S.W.3d 743, 748 (Tex. App.—Fort Worth 2011, no pet.); *Tex. Tech Univ. Health Scis. Ctr. v. Ward*, 280 S.W.3d 345, 349-50 (Tex. App.—Amarillo 2008, pet. denied); *see* Act of May 28, 1983, 68th Leg., R.S., ch. 530, § 1, 1983 Tex. Gen. Laws 3084, 3085 (repealed, recodified, and amended 1985). At that time, the TTCA also provided, "[t]he provisions of this Act shall be liberally construed to achieve the purposes hereof." *Redden*, 335 S.W.3d at 748; *Ward*, 280 S.W.3d at 350; *see* Act of May 14, 1969, 61st Leg., R.S., ch. 292, § 13, 1969 Tex. Gen. Laws 874, 877, repealed by Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 9, 1985 Tex. Gen. Laws 3242, 3322. When the legislature recodified the TTCA two years after *Salcedo*, it deleted the word "some" and repealed the provision mandating liberal construction. *Redden*, 335 S.W.3d at 748; *Ward*, 280 S.W.3d at 350; *see* Act of May 17, 1985, 69th Leg., R.S., ch. 959, §§ 1, 9–10, 1985 Tex. Gen. Laws 3242, 3303, 3322.

After the amendment of the TTCA, the supreme court began limiting *Salcedo* and the waiver of immunity under section 101.021(2); lower courts followed suit. *See Redden*, 335 S.W.3d at 748; *Kamel v. Univ. of Tex. Health Sci. Ctr. at Houston*, 333 S.W.3d 676 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Several cases illustrate this progression.

In *University of Texas Medical Branch v. York*, 871 S.W.2d 175, 176 (Tex. 1994), the patient, who was improving from severe injuries he sustained in a car accident that left him partially paralyzed, was admitted to UTMB for an inpatient program. Shortly after his admission, the patient broke his hip which went undiagnosed for approximately eight days. *Id.* He suffered severe pain, withdrawal, depression, and regression in his rehabilitation. *Id.* The patient's father sued UTMB and alleged misuse of tangible personal property by "failing to note in [the patient's] medical records" the events of the day he broke his hip and in "failing to memorialize in writing numerous other observations concerning [his] condition." *Id.* The patient's father further alleged misuse of medical records by "failing to follow a recommendation noted in the records for an x-ray of [the patient's] hip." *Id.* A jury returned a verdict in York's favor, which was affirmed by the court of appeals. *Id.*

Recognizing that the recodified version of the TTCA eliminated the mandate for liberal construction and instead called for construction subject to the general principles of statutory construction in § 311.023 of the Code Construction Act, the supreme court held that mere information, which may or may not be recorded in a patient's medical records, does not constitute use, misuse, or non-use of tangible personal property under section 101.021(2) of the TTCA. *Id.* at 179. The supreme court reversed the judgment and rendered judgment in favor of UTMB. *Id.* While paper itself can be touched, handled, and seen, the court reasoned that medical

information recorded on paper is not tangible personal property; information is intangible. *Id*. at 176, 179. The court noted that the plaintiff had not alleged any misuse of any hospital device or equipment. *Id*. at 178. It also stated that "*Salcedo* does not permit claims against the State for misuse of information." *Id*. at 179.

In *Bossley*, 968 S.W.2d at 340–41, a mental patient escaped through unlocked doors from a mental hospital and committed suicide by throwing himself in front of a truck; his parents sued, claiming that the patient's death was caused by the unlocked doors, and thus MHMR waived its liability under section 101.021(2). The trial court granted summary judgment in favor of MHMR based on sovereign immunity, and the plaintiffs appealed. *Id*. at 341. The appellate court applied *Salcedo*, reasoning that the involvement of "some condition or use of tangible property is enough" for waiver of immunity and reversed the trial court. *Id*. at 342.

The supreme court reversed the appellate court and rendered judgment that plaintiffs take nothing. *Id*. at 344. In explaining its earlier holding in *Salcedo*, the court declared that while some involvement of property was necessary, mere involvement, without causation, was insufficient. *Id*. at 342. The supreme court also stated: "The court of appeals in this case took our comment in *Salcedo* to mean that for immunity to be waived, 'the property . . . does not have to be the instrumentality of harm, it need only be involved.' In other words, the court concluded that some involvement of property is all that is required for immunity to be waived by Section 101.021(2). But we did not say in *Salcedo* that the involvement of property is *sufficient* for waiver of immunity, as the court of appeals concluded; we said only that the involvement of property is *necessary*." *Id*. (emphasis in original) (citation omitted).

The supreme court stated that the "requirement of causation is more than mere involvement, although exactly how much more has been difficult for courts

to define.  If only involvement were required, the waiver of immunity would be virtually unlimited, since few injuries do not somehow involve tangible personal or real property." *Id*. at 343.  The court stated that requiring only that a condition or use of the property be involved would conflict with the TTCA's basic purpose of waiving immunity only to a limited degree.  *Id*.  The court also held that "[p]roperty does not cause injury if it does no more than furnish the condition that makes the injury possible."  *Id*. at 343.  The court concluded that, while the unlocked doors permitted the patient's escape, they did not cause his death, and thus the nexus between the use or condition of the doors and the patient's death was too attenuated to constitute a waiver of immunity.  *Id*.  Importantly, the supreme court declared: "The decision in *Salcedo* is limited to its facts."  *Id*. at 342.

In *Miller*, 51 S.W.3d at 588, the supreme court found that the plaintiff's claim did not fall within section 101.021(2) and again narrowed the application of the TTCA's waiver provision.  Miller, an inmate, was treated by TDCJ's staff for nausea and severe headaches; he was given pain medication and other medications for fifteen days, after which he was hospitalized and diagnosed with cryptococcal meningitis, which caused his death.  *Id*. at 585.  His widow filed suit alleging that Miller's death was caused by misuse of tangible property by (1) improperly administering pain medications and fluids which masked the symptoms of meningitis, (2) improperly reading and interpreting fever-detecting equipment, and (3) improperly using clinic facilities and equipment in diagnosing and treating Miller.  *Id*.  She further alleged that TDCJ staff members were negligent in "failing to practice medicine in an acceptable manner," failing to evaluate Miller in a timely manner, failing to make a proper diagnosis, failing to order appropriate laboratory tests, and failing to treat Miller's true condition.  *Id*.

15

The supreme court noted that the widow's "petition alleged generally that TDCJ was negligent in its treatment of her husband by failing to diagnose meningitis. But the Tort Claims Act does not waive sovereign immunity for all negligence claims against governmental units. Accordingly, [the widow] sought to bring her claim within the 'condition or use of tangible . . . property' . . . waiver provision by also alleging that misuse of various medications and medical equipment masked the diagnosable symptoms of the fatal disease." *Id*. at 587. The court stated that "[w]hile this is an attractive attempt to distinguish our non-use cases, we are not persuaded." *Id*. at 588. "'There cannot be waiver of sovereign immunity in every case in which medical treatment is provided by a public facility. Doctors in state medical facilities use some form of tangible personal property nearly every time they treat a patient.'" *Id*. (quoting *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 585-86 (Tex. 1996)).

The court stated that while TDCJ did "use" various drugs and medical equipment in treating the inmate, it is not sufficient for waiver purposes "that some property is merely involved . . . . Using that property must have actually caused the injury." *Id*. The court concluded that Miller's treatment might have furnished the condition that made his injury possible, but treatment did not hurt him, make him worse, or actually cause his death." *Id*.

In *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003), Whitley sued the Dallas Area Rapid Transit Authority under the TTCA after a fellow bus passenger, Burkley, severely beat him. After Burkley verbally harassed and threatened Whitley, the bus driver told Whitley to exit the bus and that he would return for Whitley in a few minutes. *Id*. at 541–42. The bus did not return; Burkley disembarked at the next stop; recruited her son and his friends to join her vendetta; and attacked Whitley. *Id*. at 542. Whitley sued Dallas Area Rapid

Transit Authority for negligence, arguing that "his injuries ar[o]se from a use of the bus because the bus driver wrongfully ejected him in a remote and dangerous area of Dallas, allowed Burkley to deboard after she assaulted and threatened him in the driver's presence, and then failed to pick him up as promised." *Id.*

The supreme court stated that it has "consistently required a nexus between the operation or use of a motor-driven vehicle or equipment and a plaintiff's injuries." *Id.* at 543. "This nexus requires more than mere involvement of property;" the property's use must have actually caused the injury. *Id.* The court also stated that, "as with the condition or use of property, the operation or use of a motor vehicle 'does not cause injury if it does no more than furnish the condition that makes the injury possible.'" *Id.* (quoting *Bossley*, 968 S.W.2d at 343). Therefore, the court concluded that Burkley and her cohorts caused Whitley's injuries, and the driver's failure to supervise Burkley may have contributed, but the operations or use of the bus did not. *Id.* Accordingly, Whitley's claim does not fall within the limited waiver of sovereign immunity. *Id.* at 543-44.

Several intermediate courts of appeals have followed these more recent supreme court cases in limiting *Salcedo*'s application.

In *Gainesville Memorial Hospital v. Tomlinson*, 48 S.W.3d 511, 512-14 (Tex. App.—Fort Worth 2001, pet. denied), Tomlinson sued the hospital for injuries she sustained after falling out of a hospital bed; she contended that the hospital acted tortiously "[i]n using, misusing, or not using laboratory *results* obtained from blood drawn from [her] by [the hospital] utilizing medical diagnostic devices so as to know that [her] H & H[3] was falling . . . ." *Id.* (emphasis in original). She further contended that "it was not appropriate to leave her up and unattended in the condition she was in at the time." *Id.* The court of appeals held

---

[3] "H & H is an abbreviation for Hemoglobin and Hematocrit." *Id.*

that the hospital did not waive sovereign immunity under the tangible property exception to the TTCA because Tomlinson's claim did not demonstrate the use or misuse of tangible personal property. *Id*. at 514. The court relied on the Texas Supreme Court opinion in *York* and stated that "Tomlinson's allegation is that [the hospital] used, misused or failed to use laboratory *results*. Laboratory results are not tangible property merely because they are recorded on paper which is tangible. This constitutes an allegation of use or misuse of information. Information itself is an abstract concept, lacking corporeal, physical, or palpable qualities and, therefore, intangible." *Id*. (emphasis in original) (citations omitted).

In *Anderson v. City of San Antonio*, 120 S.W.3d 5, 6 (Tex. App.—San Antonio 2003, pet. denied), the plaintiffs sued the City after Anderson died of a heart attack, alleging that the EMTs failed to transport Anderson to the emergency room because they negligently misinterpreted the electrocardiogram and ignored his pleas that he was having a heart attack. Relying on *Whitley*, the court of appeals held that the use of an electrocardiogram machine did not cause Anderson's death by heart attack after he received two electrocardiograms — the results of which were disputed — and was not transported to the emergency room despite his pleas that he was having a heart attack. *Id*. at 6–7, 9. Rather, Anderson's "death was caused by his cardiac condition and the EMTs' alleged negligence. It was not caused by the use of the EKG machine." *Id*. at 9.

In *University of Texas Medical Branch v. Thompson*, No. 14-06-00014-CV, 2006 WL 1675401, at \*1-2 (Tex. App.—Houston [14th Dist.] June 20, 2006, no pet.) (mem. op.), Thompson sued UTMB after she was not diagnosed with appendicitis until her third visit to the emergency room. She alleged UTMB's physicians and nurses harmed her by improperly administering medications that masked the symptoms of appendicitis; using x-ray equipment that is not capable of

18

diagnosing appendicitis; and misusing diagnostic equipment such as a stethoscope, blood pressure machines, and thermometers in a way that failed to recognize the signs and symptoms of her illness. *Id*. at 2. Thompson asserted that the tangible personal property used by the physicians that invoked the TTCA's limited waiver of immunity were: pain medications, the x-ray machine, and various diagnostic equipment including a stethoscope, blood pressure machine, and a thermometer. *Id*.

This court relied on the Texas Supreme Court's holding in *Miller* that "mere involvement of tangible personal property in the treatment is not enough to waive immunity; instead, that property must have actually caused the injury." Thompson alleged that she was given symptom-masking drugs, that UTMB's emergency room personnel did not properly use medical diagnostic tools to timely diagnose her appendicitis. "These allegations do not meet the Tort Claims Act's causation requirement because none of the property involved in [her] medical treatment actually harmed" her. *Id*.

In *Lanphier v. Avis*, 244 S.W.3d 596, 599 (Tex. App.—Texarkana 2008, pet. dism'd as moot), *disapproved on other grounds by Franka v. Velasquez*, 332 S.W.3d 367 (Tex. 2011), Avis filed a health care liability suit against two nurses alleging negligence in failing to properly carry out their nursing responsibilities. Avis claimed that, even though she began experiencing labor pains accompanied by a high fever and vomiting, and a fetal monitor strip showed her fetus to be in distress, her labor was allowed to proceed for eight hours. *Id*. After the nurses were unable to locate a fetal heart tone, a cesarean section surgery was performed and Avis's baby was delivered stillborn; a timely delivery would have allowed Avis's baby to survive. *Id*.

The court relied on the supreme court's opinions in *York*, *Bossley*, and

19

*Miller*. It concluded that Avis's allegations against the nurses did not "concern use of tangible property" and fell outside the TTCA's waiver of sovereign immunity. *Id*. at 606. The court noted that Avis did not allege that the nurses failed to watch the fetal monitor, that they used the monitor improperly, or that the injuries to her infant were caused by a device used during delivery. Instead, Avis alleged that "the nurses should have taken alternate actions based on the information generated by the monitor. No device used during the delivery is alleged to have caused the injury to Avis's infant." The court also stated: "Since Avis's allegations here are more accurately characterized as allegations that the nurses took the wrong course of action based on the information from the monitor, we reiterate that information is not treated as tangible property under the TTCA."

In *Ward*, 280 S.W.3d at 356, the Amarillo Court of Appeals held that the alleged misuse of a fetal heart monitor was insufficient to waive immunity under section 101.021(2). The court stated that given the elimination of the mandate to liberally construe the TTCA's waiver provisions and the supreme court's trend to limit *Salcedo* and narrowly apply section 101.021(2) to cases involving a causation nexus between the use of tangible property and complained of injury or death, "the Wards have not demonstrated that 'use' of the fetal heart rate monitor caused their injury. They did not allege that the monitor was incorrectly used or that its results were erroneous. Rather, they couched their allegations as 'failing to recognize and respond,' which are allegations of misuse of information and negligence by medical staff." *Id*. The court also concluded that the Wards failed to establish a nexus between the use of the monitor and the stillborn birth of their child; the evidence indicated that the cause of death was a true knot in the umbilical cord. *Id*.

In *Redden*, 335 S.W.3d at 744, plaintiffs sued Denton County under the TTCA after Redden died while being incarcerated; plaintiffs alleged misuse of the

county's electrocardiogram machine by misinterpreting the data derived from the machine that led to Redden's improper treatment and death. Considering the amendments to the TTCA as well as the development in the case law since the supreme court's decision in *Salcedo*, the court of appeals held that, because "the 'use' of tangible property must involve the use of a medical machine, not the 'use' of information from the medical machine," the plaintiffs' claim as alleged does not fall under the TTCA. *Id*. at 747-51.

The court stated that it based its holding on three factors in particular. *Id*. at 751. "First, a plain reading of the TTCA requires that the use of tangible property cause personal injury or death." *Id*. "It is undisputed here that the EKG machine itself did not injure Redden." *Id*. "Nor was it alleged that the machine produced inaccurate information that led to his death." *Id*. "Rather, [plaintiff]s alleged only that the accurate information produced by the machine was misused by the medical staff." *Id*. "Therefore, it is the medical staff that allegedly caused Redden's death, not the machine or the machine's use." *Id*. Second, the court stated that information is not tangible property as stated by the supreme court in *York*. *Id*. Third, the court concluded that the supreme court's opinion in *Whitley* mandates a finding that the plaintiffs' claim as alleged does not fall within the TTCA's waiver of immunity. *Id*.

Qi states that this court in *Hardy* and the El Paso Court of Appeals in *Lucero* applied *Salcedo* to find a waiver of sovereign immunity under analogous circumstances; Qi asks us to find waiver in this case. We decline for several reasons.

First, the supreme court limited *Salcedo* to its facts. *Bossley*, 968 S.W.2d 342 ("The decision in *Salcedo* is limited to its facts."). The court subsequently has explained that "information itself is an abstract concept, lacking corporeal,

21

physical, or palpable qualities.  Information thus, is intangible." *York*, 871 S.W.2d at 179.  The fact that information is recorded in writing on paper or by a medical device does not render the information tangible property.  *See id.*

Qi's expert, Dr. Caughey, testified that the two blood pressure readings taken on January 12 were not performed improperly.  Dr. Caughey answered "no" to questions asking whether he had seen anything in the records leading to a conclusion that Dr. Rauth and Nurse Griffice were negligent in the way they used the blood pressure cuff and urine test strips.  No evidence suggests that the blood pressure readings were recorded improperly.  Dr. Caughey does not dispute the accuracy of the dipstick test result that came back trace positive, and does not believe the dipstick test was performed in an inappropriate manner.  This testimony confirms that Qi's allegations rest upon the results produced by blood pressure equipment and urine test strips rather than the use of this equipment; these results are information.  Because information is intangible property, the results also are intangible property.  Accordingly, the use of results produced by medical equipment constitutes, at most, use of intangible property.

Based on the language in the TTCA and the development of case law after *Salcedo*, the "use" of tangible property at issue must involve the use of the medical equipment itself and not merely the use of information from the medical equipment.  *See Redden*, 335 S.W.3d at 751; *Ward*, 280 S.W.3d at 356.  Thus, the "use" of property requires more than reading and interpreting data produced by medical equipment.

Here, Qi does not base her claims upon use of the medical equipment itself; instead, she bases her claims on the alleged use or misuse of information produced by the medical equipment.  Qi does not allege that the medical equipment was used inappropriately or incorrectly, or that the equipment's results were erroneous, or

22

that the results were recorded erroneously. Dr. Caughey's criticism centered around his contention that UTMB employees violated the standard of care because they "didn't go further in the work-up" and did not further evaluate Qi for preeclampsia. Dr. Caughey opined that the blood pressure measures and the urine test by dipstick the UTMB employees performed yielded insufficient information to rule out a diagnosis of preeclampsia. He opined that a series of blood pressure readings taken at least six hours apart and a 24 hour urine collection are necessary to make a proper diagnosis of preeclampsia.

Second, Qi incorrectly asserts that tangible personal property need not have actually caused the stillbirth as long as it was a "substantial factor in bringing about the injury." The use of tangible property "must have actually caused the injury." *Whitley*, 104 S.W.3d at 543. In other words, the tangible property must be the instrumentality of the harm. *Jackson*, 354 S.W.3d at 884; *Robinson*, 171 S.W.3d at 369; *see Bossley*, 968 S.W.2d at 342. Here, Qi's claim cannot go forward in the absence of an allegation that the blood pressure equipment and urine test strips were the instrumentality that caused the harm.

Qi does not allege that the medical equipment caused the stillbirth of her baby. Instead, she claims that the cause of the stillbirth was the failure to do further testing to diagnose her with preeclampsia and treat her appropriately by inducing labor. Accordingly, Qi failed to allege a nexus between the use of the medical equipment in this case and the stillbirth.

Third, we are not bound to follow *Lucero*; nor are we persuaded by it in light of the supreme court's limitation of *Salcedo*. In *Lucero*, the plaintiffs alleged the negligent misuse of equipment, "specifically an abdominal CT scan that indicated liver abscess; and the failure to properly and timely diagnose and treat Lucero's bile leak, liver bilomas, and abscess." 234 S.W.3d at 169. The court of appeals

23

distinguished *Whitley* as not involving misuse of diagnostic medical equipment and followed *Salcedo*; the court concluded there is a waiver of sovereign immunity because "[l]ike the electrocardiogram graph in *Salcedo*, an abdominal CT scan and its films are used in diagnosing various conditions of the abdomen," and the "Lucero plaintiffs alleged and offered evidence to prove that there was a misuse of the abdominal CT scan." *Id*. at 172. The court, however, did not state that the use or misuse of the CT scan actually caused the injury.

Finally, we believe that *Hardy* is distinguishable from the present case and more analogous to *Thompson*. In *Hardy*, the patient was connected to a cardiac monitor while recovering from bypass surgery and, when the monitor sounded an alarm due to a complete heart block and heart stoppage, resuscitation efforts were not commenced for at least five minutes. 2 S.W.3d at 608-09. The patient never regained consciousness and was taken off life support. *Id*. at 609.

Relying on *Salcedo*, the court held that the plaintiff's allegations that failure to pay proper attention to the cardiac monitor (1) constituted a use or misuse of tangible property and (2) proximately caused the patient's death were "sufficient to bring the case within the waiver of governmental immunity under section 101.021(2) of the TTCA." *Id*. at 610. The court noted that "the use of the cardiac monitor directly affected the decedent by monitoring her heart's activity, and served as an early warning device in case of a problem. The cardiac monitor could only be effective, however, if it was properly monitored at all times. Unfortunately, the person responsible for monitoring the cardiac monitor failed to do so, resulting in the death of the decedent from the very condition that the proper use of the cardiac monitor was intended to avoid." *Id*.

*Hardy* stated that the cardiac monitor was "put into service" for the purpose of monitoring the patient's heart and that the hospital employee's failure to pay

attention to the monitor constituted a use or misuse of the monitor; *Hardy* did not conclude that misreading or misinterpreting results or information generated from the monitor constituted use of tangible property. *Id.* Nor did the plaintiff allege misreading or misinterpreting of monitor results. *Id*. at 609. Further, the cardiac monitor sounded an alarm due to heart stoppage, and no other reading, interpretation, or action was necessary for the patient's diagnosis. Here, the blood pressure equipment and urine test strips did not show a diagnosis of preeclampsia that UTMB's employees simply misread or misinterpreted as not showing preeclampsia. The blood pressure equipment showed an elevated blood pressure, and the urine test strips showed protein in the urine. This information was insufficient to diagnose Qi with preeclampsia and then treat Qi appropriately; according to Qi's expert, a series of blood pressure measures and a 24 hour urine collection were necessary for a proper diagnosis.

We conclude that Qi's allegations do not meet the TTCA's requirement that use of tangible property actually caused the harm in this case.

## II.    Substance of Complaint is the Failure to Diagnose and Treat

In determining whether sovereign immunity has been waived, courts look to the real substance of a plaintiff's cause of action, not the plaintiff's characterization of her claims. *Thompson*, 2006 WL 1675401, at \*4 (citing *Whitley*, 104 S.W.3d at 543, and *Bossley*, 968 S.W.2d at 343). Here, the real substance of Qi's suit is that UTMB's employees failed to timely diagnose Qi with preeclampsia and induce delivery of her baby; this failure allegedly resulted in the stillbirth of her baby and her injury that would not have occurred if she had been timely and properly diagnosed and treated. "However, a state entity's failure to act does not invoke the Tort Claims Act's limited waiver of immunity." *Thompson*, 2006 WL 1675401, at \*4 (citing *Kassen v. Hatley*, 887 S.W.2d 4, 14 (Tex. 1994)). Because the real

25

substance of Qi's cause of action is a failure to act, Qi's suit does not invoke the Tort Claims Act's waiver of immunity. *See id.*

Further, none of the remaining allegations in Qi's petition allege a use or misuse of tangible property: "[UTMB's] employees were negligent and proximately cause[d] [Qi]'s injuries"

b.    In deviating from the standard of care for the treatment of high blood pressure and preeclampsia;

c.    In failing to properly and timely diagnose high blood pressure and preeclampsia;

d.    In failing to counsel Plaintiff on the possibility of developing preeclampsia and the symptoms to watch for.

c.    In failing to properly treat Plaintiff's condition;

d.    In failing to admit Plaintiff to the hospital for observation;

g.    In failing to order the appropriate tests;

h.    In failing to refer Plaintiff to a specialist or a physician qualified to confirm diagnosis and treat Plaintiff, or to consult with such a specialist or physician concerning Plaintiff's condition

Instead, as noted above, Qi's allegations state a complaint of the medical judgment exercised by UTMB's employees. The TTCA does not waive immunity for claims alleging erroneous medical judgment. *See Univ. of Tex. Health Sci. Ctr. v. DeSoto*, No. 14-12-00620-CV, 2013 WL 1169126, at *6 (Tex. App.—Houston [14th Dist.] March 21, 2013, no pet. h.). Therefore, Qi's remaining allegations cannot waive UTMB's immunity under the TTCA.

Although a plaintiff may be afforded an opportunity to amend pleadings, when pleadings affirmatively negate the existence of jurisdiction, they are considered incurably defective and cannot be cured by a plaintiff's assertion of more detailed facts. *See Univ. of Tex. M.D. Anderson Cancer Ctr. v. King*, 329 S.W.3d 876, 881 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Qi has

failed to plead sufficient factual allegations that the negligent use of tangible property by a state employee caused the stillbirth and injury within the waiver of sovereign immunity contained in section 101.021(2). *See id.* Qi's allegations are incurably defective; therefore, Qi cannot cure the defects by pleading more detailed facts to support her assertion that the stillbirth and injury were caused by the acts or omissions listed in her live petition. *See id.*

## Conclusion

We sustain UTMB's sole issue. We reverse the trial court's order denying UTMB's plea to the jurisdiction and render judgment dismissing Qi's suit against UTMB for lack of jurisdiction.[4]

/s/     William J. Boyce
        Justice

Panel consists of Justices Boyce, McCally and Donovan.

---

[4] In light of our disposition, we deny the parties' joint motion to stay jury trial and all other trial court proceedings as moot.