**Reversed and Remanded and Memorandum Opinion filed December 31, 2019.**



In The

# Fourteenth Court of Appeals

### NO. 14-18-00758-CV

## THE UNIVERSITY OF TEXAS MEDICAL BRANCH AT GALVESTON, Appellant

### V.

## JAYSON CRAWFORD, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF TRACY CRAWFORD, DECEASED, Appellee

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Cause No. 16-CV-1419**

## M E M O R A N D U M   O P I N I O N

In this medical-malpractice wrongful-death case, the University of Texas Medical Branch at Galveston ("UTMB") challenged the trial court's jurisdiction on the ground that appellee Jayson Crawford's claims do not fall within the Texas Tort Claims Act's waiver of immunity from suit for personal injury and death proximately caused by the use of tangible personal property. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.021(2). Because the gravamen of Crawford's complaint is

that the diagnosis and treatment of decedent Tracy Crawford were delayed by UTMB's negligent failure to obtain and act upon intangible information, the trial court reversibly erred in denying UTMB's plea and motion to dismiss. We further conclude that no repleading can bring the claims within the Act's ambit. We therefore reverse the trial court's denial of UTMB's plea to the jurisdiction and remand the case with instructions to dismiss the claims against UTMB.

## I. BACKGROUND[1]

Tracy Crawford presented to UTMB's emergency room at around 9:30 a.m. complaining of chest pain and shortness of breath that began "just prior" to her arrival. She was placed under the care of Drs. Wakili Yarima and Jonathan Soto, and an electrocardiogram was immediately performed, with normal results. Dr. Soto ordered a blood test to determine the level of the muscle protein troponin in Tracy's blood. A blood sample was drawn at 10:00 a.m., and when the lab reported the results forty-five minutes later, Tracy's troponin level was normal. A note on the lab report states, "Cardiac troponin begins to rise 3–4 hours after the onset of ischemia. Repeat in 4–6 hours if the sample was drawn within 3–4 hours of the onset of the symptom and found normal."

A chest x-ray also did not reveal the cause of Tracy's pain, and doctors began ruling out other non-cardiac causes. Tracy's urine tested negative for drugs,[2] and an abdominal scan did not explain her symptoms.

---

[1] The chronology of Tracy's treatment is taken from the medical records Jayson produced in response to UTMB's plea to the jurisdiction.

[2] In his response to UTMB's plea to the jurisdiction and on appeal, Jayson refers to the drug screen as a blood test; however, the medical records he introduced into evidence unambiguously identify the drug screen as a urine test. There is no evidence to the contrary.

Tracy's pain continued, and at 4:17 p.m., Dr. Yarima ordered another troponin test. The blood sample was collected twenty minutes later, but before the laboratory reported the results, Tracy underwent a second electrocardiogram, which revealed her acute myocardial infarction. Tracy was taken to the cardiac catheterization lab at around 5:45 p.m., and about twenty minutes later, the laboratory analyzing Tracy's most recent blood sample reported that she had extremely elevated troponin levels.

The cardiac catheterization showed that Tracy's proximal anterior descending artery was completely blocked. Doctors removed the clots and placed a stent, but two days later, the damage to her heart had progressed to the point of cardiogenic shock. She died five days later from multiple organ failure.

Tracy's husband Jayson, individually and on behalf of Tracy's estate, sued Dr. Yarima and UTMB for medical malpractice.[3] He alleged that UTMB was negligent "[i]n its misuse of the tangible personal property, specifically the troponin tests," and in "failing to diagnose and treat the myocardial infarction in a timely manner using tangible property, which would have ultimately saved her life." UTMB filed a combined plea to the jurisdiction and motion to dismiss on the ground that Jayson's claims did not fall within the Texas Tort Claims Act's waiver of sovereign immunity from suit for injuries and deaths caused by the use of tangible personal property.[4] According to UTMB, Jayson's claims were really about the use of medical judgment and the failure to collect and use diagnostic information. Jayson argued in response and on appeal that UTMB caused Tracy's death by misusing her blood.

---

[3] These are the defendants named in Jayson's First Amended Petition; his original petition is not in the record.

[4] The Act's other waiver provisions are inapplicable.

The trial court denied UTMB's plea to the jurisdiction and motion to dismiss, and UTMB timely filed this interlocutory appeal.

## II. STANDARD OF REVIEW

Unless waived or abrogated, sovereign immunity shields the state and its agencies from a lawsuit for damages by depriving the trial court of subject-matter jurisdiction. *See Univ. of Hous. v. Barth*, 403 S.W.3d 851, 853 (Tex. 2013) (per curiam) (dismissing case for lack of subject-matter jurisdiction where sovereign immunity was not waived); *Hearts Bluff Game Ranch, Inc. v. State*, 381 S.W.3d 468, 476 (Tex. 2012) (sovereign immunity applies to lawsuits for damages). The plaintiff bears the burden to establish the trial court's jurisdiction. *See Heckman v. Williamson County*, 369 S.W.3d 137, 150 (Tex. 2012).

Whether the trial court has subject-matter jurisdiction is a question of law that can be challenged by a plea to the jurisdiction. *See Suarez v. City of Texas City*, 465 S.W.3d 623, 632 (Tex. 2015). We review the trial court's ruling on a plea to the jurisdiction by determining whether the plaintiff's pleadings, construed in the plaintiff's favor, allege facts sufficient to affirmatively demonstrate the trial court's jurisdiction over the claim. *See Hearts Bluff*, 381 S.W.3d at 476. If relevant to the jurisdictional issue, we also consider the evidence submitted by the parties. *Tex. Nat. Res. Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001). In performing our review, "we look to the true nature of the dispute" rather than the plaintiff's characterization of the claims. *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 513 (Tex. 2019); *see also Univ. of Tex. Med. Branch at Galveston v. Kai Hui Qi*, 402 S.W.3d 374, 389 (Tex. App.—Houston [14th Dist.] 2013, no pet.). If the plaintiff's pleadings affirmatively negate jurisdiction or are incurably defective, then the court may grant the plea to the jurisdiction without giving the plaintiff the opportunity to amend. *See Heckman*, 369 S.W.3d at 150;

4

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. King*, 329 S.W.3d 876, 879–80 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

### III. No Waiver of Immunity

Sovereign immunity is waived to the extent of liability under the Texas Tort Claims Act. TEX. CIV. PRAC. & REM. CODE ANN. § 101.025(a). Under the Act, a governmental unit such as UTMB is liable for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." *Id.* § 101.021(2). In UTMB's first two issues, it argues that Jayson has not alleged the use of tangible personal property.

Jayson pleaded that Tracy "suffered a misdiagnosed and untreated heart attack due to the misuse of laboratory testing which progressed into cardiogenic shock." Specifically, Jayson contends UTMB "failed to order a second troponin test" within four to six hours of the initial test and, because UTMB was unaware that Tracy's troponin levels had changed, UTMB "fail[ed] to diagnose and treat the myocardial infarction in a timely manner using tangible property." He states that if UTMB had followed its own policy and performed a second troponin test four to six hours after the onset of cardiac symptoms, "this use of tangible property would have adequately diagnosed Tracy Crawford's condition within the time necessary to save her life." Jayson asserts that UTMB proximately caused Tracy's death "in its misuse of the tangible personal property, specifically the troponin tests."

A troponin "test" is not tangible personal property. Rather, a "test" is "an examination of part of the body or a body fluid for medical purposes, esp. by means of a chemical or mechanical procedure rather than simple inspection." NEW OXFORD AMERICAN DICTIONARY 1793 (Angus Stevenson & Christine Lindberg eds., 3d ed. 2010); *see also Test*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A medical

examination on part of one's body, usu. administered for diagnostic reasons."). As Jayson admitted in his response to UTMB's plea, a troponin test is a procedure that is performed on a blood sample.

In an effort to bring this claim within the Act's waiver of immunity, Jayson argues that UTMB caused Tracy's death by its use of her blood, which he contends is tangible personal property. We conclude, however, that the claim is incurably defective because the true substance of Jayson's complaint is that UTMB failed to use information it could have discovered through a timely blood test. Thus, he alleges the non-use of intangible information, not the use of tangible personal property.

## A.      No Use of Tangible Personal Property

According to Jayson, the causation chain is this: Tracy died from cardiogenic shock because of the progressive harm from her myocardial infarction; the damage progressed because UTMB failed to properly treat the myocardial infarction within four to six hours after she arrived at the emergency room; UTMB failed to treat the myocardial infarction during that time because that condition had not yet been diagnosed; UTMB failed to diagnose Tracy during those hours because it did not know that she had an elevated level of troponin in her blood at that time; UTMB lacked the information about Tracy's elevated troponin levels because it failed to monitor them by performing a troponin test on her blood during that time frame.

None of the events in this chain constitutes the "use" of tangible personal property. Failure to perform a diagnostic test is not a "use" of tangible personal

6

property.[5] Failure to use property is not.[6] Failure to follow a recommendation or policy is not.[7] Failure to diagnose or treat is not.[8] And failure to monitor is not.[9]

Moreover, the true foundation of Jayson's complaint is that UTMB failed to obtain the information that a timely second troponin test would have revealed. He contends that four to six hours after Tracy arrived at the emergency room, she had abnormally large amounts of troponin in her blood indicative of myocardial infarction, but because UTMB failed to acquire this information during that time, it failed to timely diagnose and treat her. But test results are information,[10] and information is not tangible personal property.[11]

---

[5] *See Univ. of Tex. Med. Branch v. Thompson*, No. 14-06-00014-CV, 2006 WL 1675401, at *1, 3–4 (Tex. App.—Houston [14th Dist.] June 20, 2006, no pet.) (mem. op.) (failure to perform ultrasound or CT scan).

[6] *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996) (failure to administer an injectable drug is a non-use of tangible property).

[7] *See Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 176 (Tex. 1994) (failure to follow a recommendation for an x-ray is not the use of tangible personal property, even though the recommendation was noted in the patient's medical records); *King*, 329 S.W.3d at 880–81 (no waiver of immunity for alleged failure "to develop, employ, monitor and follow appropriate policies and procedures with regard to the assessment, treatment, management and oversight" of patients).

[8] *Thompson*, 2006 WL 1675401, at *4 (failure to diagnose and treat appendicitis).

[9] *See Kai Hui Qi*, 402 S.W.3d at 387–88 (failure to monitor blood pressure for six hours or to collect and test urine for twenty-four hours).

[10] *See Univ. of Tex. Health Sci. Ctr. at Hous. v. Dickerson*, No. 14-13-00232-CV, 2014 WL 708521, at *6 (Tex. App.—Houston [14th Dist.] Feb. 20, 2014, no pet.) (mem. op.); *Univ. of Tex. Med. Branch at Galveston v. Mullins*, 57 S.W.3d 653, 657 (Tex. App.—Houston [14th Dist.] 2001, no pet.).

[11] *York*, 871 S.W.2d at 179 ("[I]nformation, which may or may not be recorded in a patient's medical records, does not constitute tangible personal property."); *Axtell v. Univ. of Tex. at Austin*, 69 S.W.3d 261, 267 (Tex. App.—Austin 2002, no pet.) ("The medium used to communicate information does not alter its intangible nature." (quoting *Sawyer v. Tex. Dep't of Criminal Justice*, 983 S.W.2d 310, 312 (Tex. App.—Houston [1st Dist.] 1998, pet. denied))).

Our opinion in *University of Texas Medical Branch at Galveston v. Kai Hui Qi* illustrates why this is so. In that case, a pregnant patient presented to UTMB with elevated blood pressure, and a urine-dipstick test revealed trace amounts of protein. *Kai Hui Qi*, 402 S.W.3d at 376, 378. Six days later, the patient telephoned UTMB and reported vaginal bleeding and elevated blood pressure. *Id.* at 376–77. The following day, she returned to UTMB where staff discovered that the fetus had died. *Id.* at 377. The attending doctor induced labor and delivered the stillborn child. *Id.* The patient neither alleged nor presented evidence that UTMB improperly performed blood-pressure tests or the urine-dipstick test. *Id.* at 378–79, 387–88. The plaintiff instead maintained that UTMB's isolated blood-pressure readings and urine test were insufficient to rule out the preeclampsia that caused the stillbirth, and UTMB should have performed a second blood-pressure test six hours after the first elevated reading and performed a protein test on a 24-hour collection of her urine. *Id.* at 377–78. Because UTMB did not, the patient alleged that UTMB proximately caused her injuries by "the use of the blood pressure cuffs/testing equipment and urine test strips," "failing to order the appropriate tests," "failing to properly and timely diagnose high blood pressure and preeclampsia," and "failing to properly treat" those conditions.

Kai Hui Qi's allegations concerning blood-pressure tests are legally indistinguishable from Jayson's allegations in this case. In neither case did the plaintiff complain that the initial test was inappropriate, incorrectly performed, wrongly interpreted, or erroneously recorded. The plaintiff in each case instead pleaded that the initial tests UTMB performed yielded insufficient information to rule out the injury-causing condition and that the test should have been repeated within a certain number of hours. Both plaintiffs alleged that because UTMB failed

to timely repeat the initial test, UTMB failed to timely diagnose and treat the condition with which the patient presented.

We conclude, as we did in *Kai Hui Qi*, that such allegations rest upon the results obtained from medical tests, not upon the use of tangible personal property to perform the test. *See id.* at 388. A medical test result is intangible information, not tangible personal property. *See id.* If, as suggested by the plaintiffs in both cases, UTMB improperly relied on initial test results to prematurely rule out the dangerous condition with which the patient presented, then this is a complaint that UTMB negligently interpreted those initial test results. As Jayson concedes, the Act does not waive immunity for a medical provider's failure to properly interpret information. *See id.* at 390.

## B.  *Salcedo* and *Hardy* Are Not Controlling

In arguing that he has sufficiently alleged waiver of immunity, Crawford relies heavily on *Salcedo v. El Paso Hospital District*, 659 S.W.2d 30 (Tex. 1983), and *University of Texas Medical Branch at Galveston v. Hardy*, 2 S.W.3d 607 (Tex. App.—Houston [14th Dist.] 1999, pet. denied). Crawford's reliance on these cases is misplaced. As we explained in *Kai Hui Qi*, *Hardy* relied on *Salcedo*, and *Salcedo* was based on a prior version of the Texas Tort Claims Act. *See Kai Hui Qi*, 402 S.W.3d 382–83, 387.

In *Salcedo*, the patient went to the emergency room of a hospital within the El Paso Hospital District where he complained of chest pains. *Salcedo*, 659 S.W.2d at 31. A doctor employed by the District ordered an electrocardiogram but allegedly failed to recognize that the results showed the patient was having a heart attack. *Id.* The doctor released Salcedo without treatment, and Salcedo died shortly after returning home. *Id.* His surviving spouse alleged that "the hospital district's

employees or agents misused the electrocardiographic equipment by improperly reading and interpreting the graphs and charts produced by the equipment." *See id.*

The version of the Act governing *Salcedo* waived immunity for "death or personal injuries so caused from some condition or some use of tangible property, real or personal, under circumstances where such unit of government, if a private person would be liable to the claimant in accordance with the law of this state." *Salcedo*, 659 S.W.2d at 31 (quoting former TEX. REV. CIV. STAT. ANN. art. 6252–19, § 3) (italics removed). At that time, the Act also stated, "The provisions of this Act shall be liberally construed to achieve the purposes hereof." *Id.* at 32 (quoting former TEX. REV. CIV. STAT. ANN. art. 6252–19, § 13). In light of the directive to construe the Act liberally, the Supreme Court of Texas held that Salcedo's widow adequately alleged "some use" of tangible personal property. *See id.* at 32–33.

We relied on *Salcedo* in deciding *Hardy*. In *Hardy*, a patient was connected to a cardiac monitor, and although the monitor's alarm sounded when the patient's heart stopped, hospital staff allowed five minutes to pass before attempting resuscitation. *Hardy*, 2 S.W.3d at 608–09. Finding no significant distinctions between the facts in *Salcedo* and in *Hardy*, we held that the plaintiff adequately pleaded waiver by alleging that a hospital employee misused tangible personal property by "failing to properly monitor the cardiac monitor." *Id.* at 610.

But the law has changed. The Texas Tort Claims Act was recodified in 1985, eliminating not only the modifier "*some* use" but also deleting the directive to construe the Act liberally. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 101.001–.109. Given this change, the Texas Supreme Court has limited *Salcedo* to its facts. *Dall. Cty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 342 (Tex.

10

1998).[12] In doing so, the court removed the foundation on which *Hardy* was based, and we have repeatedly refused to apply *Salcedo* or *Hardy* to cases with different facts. *See, e.g.*, *Univ. of Tex. Health Sci. Ctr. at Hous. v. Dickerson*, No. 14-13-00232-CV, 2014 WL 708521, at *5–7 (Tex. App.—Houston [14th Dist.] Feb. 20, 2014, no pet.) (mem. op.); *Kai Hui Qi*, 402 S.W.3d at 381–83.

Finally, Jayson points out that the legislative act recodifying the Texas Tort Claims Act includes the comment, "This Act is intended as a recodification only, and no substantive change in the law is intended by this Act." Act of May 17, 1985, 69th Leg., R.S., ch. 959, § 10, 1985 TEX. GEN. LAWS 3242, 3322. But our analysis must be "grounded in the Tort Claims Act's language." *McKenzie*, 578 S.W.3d at 513. And when the language of the applicable version of the statute is clear and unambiguous, that language controls, not the language of a prior version. *See Cont'l Cas. Ins. Co. v. Functional Restoration Assocs.*, 19 S.W.3d 393, 399 (Tex. 2000). This is true even if the legislature intended the change in the statute's language to be non-substantive. *Id.* (citing *Fleming Foods of Tex., Inc. v. Rylander*, 6 S.W.3d 278, 286 (Tex. 1999)).

In sum, we agree with UTMB that Jayson's claims are based on the non-use of intangible information rather than the use of tangible personal property. We sustain UTMB's first two issues, and we do not reach its third issue, in which UTMB argues that Jayson has not alleged causation within the meaning of the Act's waiver provision.

---

[12] Although we cited both *Salcedo* and *Bossley* in *Hardy*, we failed to note that *Bossley* limited *Salcedo* to its facts.

## IV. CONCLUSION

Because Jayson's claims cannot be amended to bring them within the Texas Tort Claims Act's waiver of immunity for death caused by the use of tangible personal property, we reverse the trial court's denial of UTMB's plea to the jurisdiction and remand the case with instructions to dismiss the claims against UTMB.

/s/ Tracy Christopher
   Justice

Panel consists of Justices Christopher, Wise, and Hassan.