**Opinion filed May 12, 2022**



In The

# Eleventh Court of Appeals

_____

## No. 11-20-00125-CV

_____

**SYLVIA MORRISON AND RICK MORRISON, Appellants/
Cross-Appellees**

**V.**

**NANCY ASAMOA, M.D.; JOHN MCKENNA, M.D.; SATISH
MOCHERLA, M.D.; HAYAN ORFALY, M.D.; PERMIAN
PREMIER HEALTH SERVICES, INC.; ASIF ALI KHAN
ANSARI, M.D.; AND RACHNA BHARTI, M.D., Appellees**

**&**

**TEXAS TECH UNIVERSITY HEALTH SCIENCES CENTER AT
ODESSA, Appellee/Cross-Appellant**

**On Appeal from the 441st District Court**
**Midland County, Texas**
**Trial Court Cause No. CV55942**

**O P I N I O N**

In this interlocutory appeal, Appellants/Cross-Appellees Sylvia and Rick Morrison (Appellants) contend that the trial court abused its discretion in ruling that their medical expert report was deficient and in granting six separate motions to dismiss Appellants' health care liability claims against seven of the appellees.[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(10), 74.351 (West Supp. 2021).

In their respective dismissal motions before the trial court, Appellees objected on one or a combination of the following grounds. First, that Appellants' expert, Dr. James Paine, is not qualified to opine on the standard of care applicable to physicians outside of his particular area of specialization, namely obstetrics and gynecology. *See id.* § 74.351(r)(5) (West Supp. 2021), § 74.401 (West 2017). Second, that Dr. Paine's expert reports failed to adequately articulate an applicable standard of care or how the medical care provided by Appellees fell below the applicable standard of care. *See id.* § 74.351(*l*), (r)(6). Lastly, that Dr. Paine's expert report failed to adequately explain how any alleged breach caused Appellants' injuries. *See id.* After careful review of Dr. Paine's reports, we hold that the trial court abused its discretion in granting Appellees' motions to dismiss. Therefore, we reverse the trial court's order and remand Appellants' claims against Appellees to the trial court for further proceedings.

Cross-Appellant Texas Tech University Health Sciences Center at Odessa (TTUHSC) filed a separate interlocutory appeal from the trial court's order denying

---

[1]We note that the trial court also granted in part a motion to dismiss that was filed by Appellee/Cross-Appellant Texas Tech University Health Sciences Center at Odessa. Appellants, however, did not present any issue on appeal regarding the trial court's granting in part of TTUHSC's motion to dismiss. Therefore, in this opinion, we will refer to the seven non-TTUHSC appellees as "Appellees." "Appellees" are Nancy Asamoa, M.D.; John McKenna, M.D.; Satish Mocherla, M.D.; Hayan Orfaly, M.D.; Permian Premier Health Services, Inc.; Asif Ali Khan Ansari, M.D.; and Rachna Bharti, M.D.

in part its motion to dismiss.[2]  The trial court denied TTUHSC's motion to dismiss with respect to Appellants' claims arising from acts or omissions of Sylvia's original surgeon, Kathryn Hutton, D.O., an employee of TTUHSC.  On appeal, TTUHSC asserts that Appellants failed to demonstrate that TTUHSC waived its sovereign immunity under the Texas Tort Claims Act (TTCA) and, having shown that, asks that we render judgment dismissing Appellants' claims against TTUHSC for lack of subject-matter jurisdiction.  *See* CIV. PRAC. & REM. § 101.021(2) (West 2019).  For the reasons stated below, we agree.  Therefore, we reverse the trial court's order as it pertains to TTUHSC and render judgment dismissing Appellants' claims against TTUHSC with prejudice for lack of subject-matter jurisdiction.

## *Background Facts*

We base the following factual summary on the statements made in Dr. Paine's original and first supplemental expert reports.[3]

---

[2]"A person may appeal from an interlocutory order of a district court . . . [that] denies all or part of the relief sought by a motion under Section 74.351(b)[.]"  CIV. PRAC. & REM. § 51.014(a)(9).  Section 74.351(b) specifies that when a physician or health care provider moves to dismiss a report as untimely filed, the court shall dismiss the claims with prejudice.  *Id.* § 74.351(b).  Section 74.351(c) permits the trial court to grant a 30-day extension when the reason that the expert report is untimely is "*because* elements of the report are found deficient."  *Id.* § 74.351(c) (emphasis added).  "Section 74.351(b) specifically references and must be read with the paragraph that follows it, Section 74.351(c), which recognizes that 'an expert report has not been served within the period specified by Subsection (a) [when] elements of the report are found deficient.'"  *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459 (Tex. 2017) (quoting *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008)).  As such, when the trial court denies a physician or health care provider's motion to dismiss an expert report as deficient, interlocutory appeal is available under Section 51.014(a)(9) because an attack on the report's adequacy is always also an attack on the report's timeliness.

[3]Some of the medical terms common to healthcare providers are not defined in the report.  Hereafter in this opinion, we consult dictionaries to discern the meaning of common-usage medical terms and take judicial notice thereof for the purposes of this opinion only.  None of the briefing engages in a dispute over the meaning of these terms, nor does the argument turn on those terms.  These are facts that are "not subject to reasonable dispute" in that they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *See* TEX.R. EVID. 201(b)(2), (d) (allowing judicial notice of adjudicative facts to be taken at any stage of the proceeding); *In re S.A.G.*, No. 02-09-00125-CV, 2010 WL 1006301, at *1 n.3 (Tex. App.—Fort Worth Mar. 18, 2010, no pet.) (mem. op.) (taking judicial notice of a medically defined term); *In re A.K.C.*, No. 02-13-00031-CV, 2013 WL 978724, at *3 n.6 (Tex. App.—Fort Worth Mar. 14, 2013, no pet., mem. op.) (judicial notice by appellate court of medically defined term); *see also Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35–38

On January 17, 2018, Sylvia Morrison underwent a total, laparoscopic hysterectomy. The surgery was performed by Dr. Kathryn Hutton, an employee of TTUHSC.[4] Sylvia sustained an injury to her ureter during that surgery and the ureteral injury resulted in leakage of urine into her peritoneal cavity. This subsequently resulted in a myriad of infections and other postoperative complications that ultimately led to her hospitalization at Midland Memorial Hospital (Midland Memorial). She was admitted on January 29, 2018, with persistent nausea, vomiting, diarrhea, abdominal pain, fever, sepsis, acute renal failure, and a high white blood cell count. Sylvia's ureteral injury and leakage of urine into her peritoneal cavity was not accurately diagnosed and properly treated until March 8, 2018, more than a month after her admission to Midland Memorial.

During her fifty-four-day hospitalization at Midland Memorial, Sylvia was seen by numerous medical doctors, including her original surgeon, Dr. Hutton, and multiple physicians, six of whom, alongside Permian Premier Health Services, Inc. (Permian),[5] are the Appellees in this matter. These include three hospitalists (Dr. Nancy Asamoa, Dr. Rachna Bharti, and Dr. Hayan Orfaly), a nephrologist (Dr. Asif Ansari), an infectious disease specialist (Dr. Satish Mocherla), and a pulmonologist (Dr. John McKenna). During Sylvia's stay at Midland Memorial, the aforementioned physicians conducted a score of invasive tests and medical procedures, haplessly treating Sylvia's persistent symptoms and infections. An ultrasound conducted on the day of her admission revealed that Sylvia was suffering from hydronephrosis, which is "cystic distension of the kidney caused by the

(Tex. 2017) (use of dictionary to discern the meaning of medical terms used in statutory language governing health care providers).

[4]Appellants' claims against TTUHSC turn on whether the hospital is vicariously liable for Dr. Hutton's individual negligence under the doctrine of respondeat superior.

[5]Dr. Ansari is a member and agent of Permian. Permian and Dr. Ansari filed their objections and motions to dismiss together. Appellants' claims against Permian rest on a theory of vicarious liability for the individual negligence of Dr. Ansari under the doctrine of respondeat superior.

accumulation of urine in the renal pelvis as a result of obstruction to outflow and accompanied by atrophy of the kidney structure and cyst formation." *Hydronephrosis*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/medical/hydronephrosis (last visited May 10, 2022).

Consistently throughout the duration of her hospitalization, Sylvia suffered from ascites and pleural effusions. These constant, abnormal buildups of fluid in parts of Sylvia's body were routinely treated with paracentesis and thoracentesis to remove those fluids.

According to Dr. Paine's expert reports, each of the six appellee-physicians and Dr. Hutton could have and should have conducted a complete differential diagnosis,[6] but they failed to do so. None of them documented any consideration that Sylvia's recent hysterectomy may have precipitated, and her subsequent pathology may be the result of, a ureteral injury that she sustained during that surgery. Dr. Paine opined that ureteral injury is a common postoperative complication seen in hysterectomy patients. Dr. Paine opined that Sylvia's recent surgery, hydronephrosis, and high white blood cell count should have prompted Appellees and Dr. Hutton to include a ureteral injury in a differential diagnosis. He concluded that the likely source of injury and infection would have been revealed by

---

[6]"This is a routine diagnostic method used in internal medicine whereby a treating physician formulates a hypothesis as to likely causes of a patient's presented symptoms and eliminates unlikely causes by a deductive process of elimination." *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 216 (Tex. 2010); *see also Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604–05 & n.24 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (en banc) (explaining that differential diagnosis "is a clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes—by comparing the patient's symptoms to symptoms associated with known diseases, conducting physical examinations, collecting data on the patient's history and illness, and analyzing that data—until a final diagnosis for proper treatment is reached"). The Merck Manual explains that, "[t]he initial differential diagnosis based on chief complaint and demographics is often large, so the clinician first generates and filters the hypothetical possibilities by obtaining [a] detailed history and doing a directed physical examination to support or refute suspected diagnoses." Brian F. Mandell, MD, PhD, *Clinical Decision-Making Strategies*, MERCK MANUAL PROFESSIONAL VERSION (May 2021), https://www.merckmanuals.com/professional/special-subjects/clinical-decision-making/clinical-decision-making-strategies (last visited May 10, 2022).

performing a serum creatine[7] test and confirmed by a CT nephrogram.[8]  But it was not until March 8, 2018, that such testing was performed.  At that point, Dr. Michael Dragun, a consulting urologist, diagnosed Sylvia's ureteral injury.  He confirmed that the original cause of Sylvia's recurring ascites, sympathetic pleural effusions, abdominal pain, and other symptoms was the ureteral injury she sustained during her hysterectomy.  On March 9, 2018, he ordered that a nephrostomy—"the surgical formation of an opening between a renal pelvis and the outside of the body," *Nephrostomy*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/medical/nephrostomy (last visited May 10, 2022)—be performed in order to prevent further draining of urine into Sylvia's peritoneal cavity.

It was not until after weeks of hospitalization that an accurate diagnosis was made and that the urine which had been leaking into Sylvia's peritoneal cavity was diverted.  Sylvia began to improve and was discharged to a rehabilitation and care facility on March 23, 2018.

*Subject-Matter Jurisdiction—Appellants' claims against TTUHSC.*

TTUHSC contends that the trial court lacks subject-matter jurisdiction because Appellants' pleadings fail to establish that TTUHSC, as a governmental unit, waived its sovereign immunity under the TTCA.  *See* CIV. PRAC. & REM. § 101.021(2).  The original answer of TTUHSC filed by the Texas Attorney General pled, as a defense to Appellants' claims, sovereign immunity and the protection of Chapter 101 of the Texas Civil Practice and Remedies Code, but no trial court ruling regarding same appears in the record.  TTUHC is entitled, however, to make this argument on interlocutory appeal.  *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94

---

[7]According to the Mayo Clinic's website, a serum creatine test measures how well the kidneys are "filtering waste from [the] blood."  https://www.mayoclinic.org/tests-procedures/creatinine-test/about/pac-20384646 (last visited May 10, 2022).

[8]"[A]n X-ray of the kidney."  *Nephrogram*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/medical/nephrogram (last visited May 10, 2022).

(Tex. 2012).  Importantly, Appellants, having had a full and fair opportunity to do so,[9] failed to plead facts and allegations that, if true, would establish that TTUHSC waived its sovereign immunity from suit and liability.

A. *Standard of Review and Applicable Law*

Unless waived or abrogated, sovereign immunity shields the state and its agencies from a lawsuit for damages by depriving the trial court of subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004).  "Whether a court has jurisdiction is a question of law that is reviewed *de novo*." *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010) (per curiam) (citing *Miranda*, 133 S.W.3d at 226).

"A party suing the governmental unit bears the burden of affirmatively showing waiver of immunity." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. McKenzie*, 578 S.W.3d 506, 512 (Tex. 2019) (citing *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001)).  "To determine whether the party has met this burden, we may consider the facts alleged by the plaintiff and the evidence submitted by the parties." *Id.* (citing *Tex. Nat. Res. & Conservation Comm'n v. White*, 46 S.W.3d 864, 868 (Tex. 2001)).  In doing so, "we 'construe the plaintiff's pleadings liberally, taking all factual assertions as true, and look to the plaintiff's intent.'" *Id.* (quoting *Heckman v. Williamson Cty.*, 369 S.W.3d 137, 150 (Tex. 2012)).  "In some instances the pleadings or record may conclusively negate the

---

[9]The Texas Attorney General filed the original answer of TTUHSC on October 7, 2019, asserting sovereign immunity and the protection of Chapter 101 as a primary defense.  Appellants filed their first amended original petition on October 31, 2019, but failed to plead any waiver of sovereign immunity.  TTUHSC filed objections to Appellant's expert report and motion to dismiss on November 20, 2019 (forty-four days after sovereign immunity was pled and twenty days after Appellants' first amended petition was filed).  Further, the hearing on TTUHSC's objections and motion to dismiss was not held until March 5, 2020 (almost five months after sovereign immunity was first pled by TTUHSC).

existence of jurisdiction, in which case the suit should be dismissed." *Rusk State Hosp.*, 392 S.W.3d at 96 (citing *Miranda*, 133 S.W.3d at 227).[10]

"When a claimant asserts a healthcare-liability claim against a governmental entity that is a healthcare provider, the claimant must comply with *both* the Medical Liability Act and the [TTCA]." *Univ. of Tex. Med. Branch at Galveston v. Tatum*, 389 S.W.3d 457, 461 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (emphasis added). The TTCA "provides a limited waiver of sovereign immunity, allowing suits to be brought against governmental units only in certain, narrowly defined circumstances." *Miller*, 51 S.W.3d at 587. For this appeal, the narrowly defined circumstance provides that:

> A governmental unit in the state is liable for . . . personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

CIV. PRAC. & REM. § 101.021(2).

To "use" tangible real or personal property means "to put or bring [the property] into action or service; to employ for or apply to a given purpose." *McKenzie*, 578 S.W.3d at 513 (quoting *San Antonio State Hosp. v. Cowan*, 128 S.W.3d 244, 246 (Tex. 2004)). "A claim of 'mere non-use' is insufficient to waive immunity; actual use is required." *Id.* (citing *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996)); *see also Miller*, 51 S.W.3d at 587–88. "Likewise, general medical malpractice claims or claims for errors in medical judgment, such as . . . failure to perform the necessary medical treatment[] and failure to use

---

[10]In *Rusk State Hospital*, where sovereign immunity was raised for the first time in an interlocutory appeal, the Texas Supreme Court stated that, if the pleadings and record neither demonstrate nor conclusively negate the existence of jurisdiction, "then in order to obtain dismissal of the plaintiff's claim, the defendant entity has the burden to show either that the plaintiff failed to show jurisdiction despite having had full and fair opportunity in the trial court to develop the record and amend the pleadings; or, if such opportunity was not given, that the plaintiff would be unable to show the existence of jurisdiction if the cause were remanded to the trial court and such opportunity afforded." 392 S.W.3d at 96.

acceptable practices, do not fall within the waiver in section 101.021(2)." *Tatum*, 389 S.W.3d at 462; *see also Univ. of Tex. M.D. Anderson Cancer Ctr. v. King*, 329 S.W.3d 876, 880–81 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (explaining that there is no waiver under the TTCA for injuries proximately caused by, *inter alia*, "(1) exercise of medical judgment, (2) use or misuse of information, [or] (3) failure to act or to use property" (footnotes omitted)). Nor does a failure to timely diagnose a patient's condition, or to order the appropriate tests in order to make a diagnosis, waive immunity under the TTCA. *See Univ. of Tex. Med. Branch at Galveston v. Kai Hui Qi*, 402 S.W.3d 374, 389–90 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

B. *Analysis*

TTUHSC argues in its cross-appeal that Appellants' claims must be dismissed for lack of subject-matter jurisdiction because "none of [Appellants'] allegations involve tangible real or personal property." They argue that "the substance of [Appellants'] claims are that Dr. Hutton, an employee of TTUHSC, failed to perform the necessary diagnostic test" and therefore that "TTUHSC, through its employees, erred in its medical judgment."[11] This is fatal, TTUHSC argues, because failure to diagnose a medical condition does not constitute a condition or use of tangible real or personal property and thus is not a grounds upon which TTUHSC might waive its sovereign immunity under Section 101.021(2).

Appellants do not defend the adequacy of their pleadings to establish a waiver of sovereign immunity under the TTCA. Rather, they argue that *we* lack subject-matter jurisdiction to consider TTUHSC's sovereign immunity defense because this is an interlocutory appeal from a trial court order denying TTUHSC's motion to

_____

[11]Dr. Hutton was named as a defendant in Appellants' original petition but was nonsuited by Appellants when they dropped her as a named defendant in Appellants' first amended petition. *See Randolph v. Jackson Walker L.L.P.*, 29 S.W.3d 271, 274 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

dismiss solely on the basis of *an inadequate expert report* under Section 74.351(*l*) and (r)(6), not a denial of TTUHSC's plea to the jurisdiction. Appellants concede that "a challenge to the trial court's subject-matter jurisdiction . . . may be raised for the first time on appeal from a *final* judgment," but they argue that "interlocutory jurisdiction is limited to a review of the trial court's interlocutory order." Appellants rely on *Brenham Housing Authority v. Davies*, to support this contention. 158 S.W.3d 53, 61 (Tex. App.—Houston [14th Dist.] 2005, no pet.), *disapproved of by Rusk State Hosp.*, 392 S.W.3d at 95 & n.3.

TTUHSC counters that appellate courts not only can but *must* consider a sovereign immunity defense raised on interlocutory appeal from an order granting or denying relief on grounds unrelated to a plea to the jurisdiction because, until the appellate court has determined whether it has subject-matter jurisdiction over the appeal, any ruling on the merits of the interlocutory appeal would be an unconstitutional advisory opinion. *See Rusk State Hosp.*, 392 S.W.3d at 95; *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam) (explaining that when a governmental entity validly asserts that it is immune to a pending claim, any decision regarding that claim other than the issue of immunity is merely advisory and the Texas Constitution forbids advisory opinions).

1. *TTUHSC may assert sovereign immunity on interlocutory appeal from an order unrelated to its plea to the jurisdiction.*

We agree with TTUHSC that it may pursue a sovereign immunity defense on interlocutory appeal from an order unrelated to its plea to the jurisdiction. The Texas Supreme Court's decision in *Rusk State Hospital* is controlling on this matter. In *Rusk State Hospital*, a state hospital moved to dismiss health care liability claims on the grounds that the expert report was inadequate. 392 S.W.3d at 91. The trial court denied the motion, and the hospital filed an interlocutory appeal pursuant to Section 51.014(a)(9). *Id.* In that appeal, the hospital, for the first time, asserted that

it was immune from suit. *Id.* at 91. The Twelfth Court of Appeals refused to consider the issue of immunity because it had not been presented to the trial court and the trial court's interlocutory order had nothing to do with the immunity issue.[12] *Id.* at 91, 94. The Texas Supreme Court reversed, holding that, "if immunity is first asserted on interlocutory appeal, section 51.014(a) does not preclude the appellate court from having to consider the issue at the outset in order to determine whether it has jurisdiction to address the merits." *Id.* at 95. The court explained:

> The inquiry is not whether section 51.014(a) *grants* appellate courts authority to review an immunity claim; rather, it is whether section 51.014(a) *divests* appellate courts of such authority. We conclude that it does not.

*Id.* at 94. The court expressly disapproved of all cases in which intermediate courts of appeals have held otherwise, including *Brenham Housing Authority*, which Appellants cite to support their argument that the only issue we may consider in this interlocutory appeal is the adequacy of Dr. Paine's expert reports. *Id.* at 95 & n.3.

We not only can determine TTUHSC's immunity defense here, but we must do so before considering the parties' merit arguments regarding the adequacy of Dr. Paine's expert reports as to a Texas governmental entity. Indeed, proceeding this way is consistent with the purpose of Section 51.014(a), "which is to increase efficiency of the judicial process." *Rusk State Hosp.*, 392 S.W.3d at 96 (citing *Tex. A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 845 (Tex. 2007)). Without jurisdiction resulting from some bona fide waiver of sovereign immunity, the adequacy of Dr. Paine's expert reports and the claims asserted against TTUHSC are irrelevant. *See id.*

---

[12]*Rusk State Hosp. v. Black*, 379 S.W.3d 283, 289–90 (Tex. App.—Tyler 2010), *rev'd*, 392 S.W.3d 88.

2. *Appellants' pleadings do not allege injury caused by a condition or use of tangible real or personal property.*

In their first amended original petition, Appellants alleged that TTUHSC, through its employee Dr. Hutton, "breached the standard of care by failing to adequately observe, diagnose, and treat Sylvia Morrison . . . [by] failing to consider a post-operative complication as the etiology of her symptoms" and that this was a "proximate cause of [Appellants'] injuries." Appellants never alleged a condition or use of tangible real or personal property nor did they otherwise allege that TTUHSC had waived its sovereign immunity, despite TTUHSC having asserted a plea to the jurisdiction based on sovereign immunity in its original answer—filed more than three weeks before Appellants filed their first amended original petition.

In his expert report, Dr. Paine opines that Dr. Hutton should "have considered the possibility of a surgical complication and sought to rule it out," but that she failed to do so. Dr. Paine opines that Dr. Hutton was negligent in "ma[king] no diagnostic interventions that would have demonstrated the right ureteral injury as the cause of all of [Sylvia's] symptoms." Dr. Paine opines that "the standard of care required Dr. Hutton to test for bowel and ureteral injury, including it in a differential diagnosis," but that she "did not do so." Dr. Paine concludes that these failures resulted in a delayed diagnosis of the ureteral injury and thereby injured Appellants by prolonging Sylvia's "hospitalization, . . . pain, sickness, and unnecessary interventions."

We have reviewed Appellants' pleadings and Dr. Paine's expert reports and note that Appellants have indeed failed to allege any facts that would effect a waiver of TTUHSC's sovereign immunity under Section 101.021(2). Appellants have alleged only that TTUHSC, through its employee Dr. Hutton, made an error in medical judgment by failing to use the information before it and perform a complete differential diagnosis. By no means have Appellants alleged that TTUHSC, through

12

its employee Dr. Hutton, injured Appellants through the use of tangible real or personal property. Rather, the negligence Appellants allege is one of *non-use*, which does not result in a waiver of immunity under Section 101.021(2). *See, e.g.*, *Miller*, 51 S.W.3d at 587–88.

Dr. Paine opines that "[t]he injury was there to be found when each of the . . . physicians saw [Sylvia], but none took the appropriate steps to find the injury even though the initial CT scan done on [January 30,] 2018 raised the issue of a right ureteral injury." With that information in hand, according to Dr. Paine, Dr. Hutton should have performed "a simple CT nephrogram," which "would have demonstrated that a right ureteral injury was present and the cause of [Sylvia's] [pathology]." Thus, Appellants allege that TTUHSC, through Dr. Hutton, failed to use readily available medical information about Sylvia to create a comprehensive workup and perform and complete differential diagnosis in order to discover her ureteral injury. Information, however, "does not constitute tangible personal property under section 101.021(2)," and a state hospital does not waive its immunity "for negligence involving the use, misuse, or nonuse of information in a patient's medical records." *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 179 (Tex. 1994). Nor does a state hospital like TTUHSC waive its immunity where its employees fail to conduct a complete differential diagnosis because the "[f]ailure to perform a diagnostic test is not a 'use' of tangible personal property." *Univ. of Tex. Med. Branch at Galveston v. Crawford*, No. 14-18-00758-CV, 2019 WL 7372163, at *3 (Tex. App.—Houston [14th Dist.] Dec. 31, 2019, no pet.) (mem. op).

TTUHSC carried its burden to show that Appellant failed to prove the existence of subject-matter jurisdiction and to plead that TTUHSC affirmatively waived its immunity, despite having a fair opportunity to do so. Appellants' pleadings are not deficient merely for a shortage of factual details in explaining how an alleged condition or use of tangible personal property by TTUHSC caused

13

Appellants' injuries. Rather, the deficiency is inherent in their claim that Dr. Hutton's *non-use* of available information, and attendant failure to conduct an adequate differential diagnosis and implement diagnostic testing, caused Appellants' injuries. No addition by Appellants of factual details or finer grained exposition to their pleadings can salvage their claim against TTUHSC or correlate to their expert report and conform therewith. *See Clint Indep. Schl. Dist. v. Marquez*, 487 S.W.3d 538, 558–59 (Tex. 2016) (reversing and rendering where there had already been amendment to the pleadings, and the effort to change the true nature of the claim by amendment was futile); *Kai Hui Qi*, 402 S.W.3d at 390 (dismissing without opportunity to amend where pleadings were "incurably defective and c[ould ]not be cured by . . . more detailed facts"); *Tatum*, 389 S.W.3d at 463 (true nature of the claim was a non-use regardless of how pled); *Tex. Sch. for the Blind & Impaired v. Dugosh*, No.03-07-00681-CV, 2010 WL 1170223, at *14 (Tex. App.—Austin March 26, 2010, pet, denied) (mem. op.). In any event, Appellants have not requested, even in the alternative, for the opportunity to replead.

Because no amount of factual detail can transform a *non-use* claim into a waiver of immunity under Section 101.021(2) and because Appellants had a fair opportunity—after TTUHSC asserted a plea to the jurisdiction based on sovereign immunity—to amend their pleadings to assert a claim of a condition, *use*, or misuse of property by TTUHSC, we sustain TTUHSC's second issue on appeal, and we render judgment dismissing Appellants' claims against TTUHSC for lack of subject-matter jurisdiction. Accordingly, other than to note that Appellants' expert report also includes no allegation or opinion related to a condition, use, or misuse of property causative of Appellants' harm, we forego further analysis of TTUHSC's first issue, which relates to the adequacy of Dr. Paine's expert reports *with regard to TTUHSC*, as that issue, without subject-matter jurisdiction, is unnecessary to the disposition of this appeal. *See* TEX. R. APP. P. 47.1.

14

*Sufficiency of Medical Expert Reports*

The purpose of the statutory requirement to provide an expert report is to weed out frivolous malpractice claims before discovery is allowed to go forward. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018); *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). The requirement of producing a compliant expert report before discovery is allowed to go forward has been described as a "low bar" and does not prohibit a defendant from later seeking summary judgment following discovery. *Baty v. Futrell*, 543 S.W.3d 689, 698 (Tex. 2018) (Johnson, J., and Brown, J., dissenting).

When reviewing the adequacy of the expert report required under Chapter 74, "we take the allegations in the report as true." *Tawa v. Gentry*, No. 01-12-00407-CV, 2013 WL 1694869, at *14 n.1 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (mem. op.) (citing *Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (explaining that, because our review is limited to the four corners of the expert's report and curriculum vitae (CV), appellate courts must accept the facts therein as true when reviewing an interlocutory appeal under Section 74.351)); *see also Abshire*, 563 S.W.3d at 221 n.1.

A. *Standard of Review and Applicable Law*

The Texas Medical Liability Act (TMLA) requires health care liability claimants to serve an expert report upon each defendant within 120 days after that defendant files an answer. CIV. PRAC. & REM. § 74.351(a); *Baylor Scott & White, Hillcrest Med. Ctr. v. Weems*, 575 S.W.3d 357, 363 (Tex. 2019).

An expert report need only provide (1) a *fair summary* of the expert's opinions regarding the applicable standard of care, (2) the manner in which the care rendered failed to meet that standard, and (3) the causal relationship between the failure to meet the standard of care and the injury suffered. CIV. PRAC. & REM. § 74.351(r)(6); *Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 878. The expert report must

actually set out what care was expected but not given. *Abshire*, 563 S.W.3d at 226 (citing *Palacios*, 46 S.W.3d at 880). The question is not whether Appellants have adequately *proved* their claims but, rather, whether they have adequately *stated* their claims against Appellees. The expert report must explain *how* and *why* the alleged negligence caused the injury in question. *Id.* at 224 (citing *Jelinek v. Casas*, 328 S.W.3d 526, 536 (Tex. 2010)). The expert must explain the basis of his statements and link his conclusions to specific facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam); *see also Columbia Valley Healthcare System L.P. v. Zamarripa*, 526 S.W.3d 453, 461 (Tex. 2017) ("[W]ithout factual explanations, the reports are nothing more than the *ipse dixit* of the experts, which . . . are clearly insufficient."). The expert report must articulate specific information about what should have been done differently, and it must explain factually how proximate cause is going to be proven. *Abshire*, 563 S.W.3d at 226. Proximate cause requires "(1) foreseeability and (2) cause-in-fact." *Zamarripa*, 526 S.W.3d at 460.

"If a plaintiff timely files an expert report and the defendant moves to dismiss because of the expert report's inadequacy, the trial court must grant the motion '*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6)[.]'" *Bowie Mem'l Hosp.*, 79 S.W.3d at 51 (quoting former version of Section 74.351(l)); *see also* CIV. PRAC. & REM. § 74.351(*l*). An expert report demonstrates a "good faith effort" when it (1) informs the defendant of the specific conduct that the plaintiff has called into question and (2) provides a basis for the trial court to conclude that the claims have merit. *Baty*, 543 S.W.3d at 693–94. "A report that merely states the expert's conclusions about the standard of care, breach, and causation" is insufficient. *Palacios*, 46 S.W.3d at 879; *accord Abshire*, 563 S.W.3d at 223. An expert's mere conclusion that the standard of care was not met does not constitute a good faith effort to comply with the statutory requirements. *Palacios*, 46 S.W.3d at

16

880. "However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits." *Id.* at 875. "The report can be informal" and "the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.*

We review a trial court's decision to grant a motion to dismiss—based on the deficiency of an expert report—for an abuse of discretion. *Abshire*, 563 S.W.3d at 223. A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52. Importantly, in determining whether the report is deficient, courts may not draw any inferences; instead, courts must consider only the information contained within the four corners of the report. *See Abshire*, 563 S.W.3d at 223; *Palacios*, 46 S.W.3d at 879. A court must review the entire report, not just specific portions or sections. *Baty*, 543 S.W.3d at 694. We defer to the trial court's factual determinations, if any, if they are supported by the evidence, but we review its legal determinations de novo. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam).

An expert report prepared by someone who is not qualified on the matters about which they opine does not represent an objective good faith effort to comply with the definition of an expert report in Section 74.351(r)(6). *See Foster v. Zavala*, 214 S.W.3d 106, 116 (Tex. App.—Eastland 2006, pet. denied) (citing *In re Windisch*, 138 S.W.3d 507, 511 (Tex. App.—Amarillo 2004, orig. proceeding)). We review a trial court's determination of whether an expert is qualified for abuse of discretion. *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 266 (Tex. App.—Fort Worth 2009, no pet.). In determining whether an expert is qualified for the purpose of penning the statutorily required report, our review is again confined to the four corners of the expert's report and accompanying curriculum vitae. *Id.* at 265–66 (citing *Bowie Mem'l Hosp.*, 79 S.W.3d at 52).

17

Experts are qualified to opine on the applicable standard of care if they (1) are practicing medicine at the time they give the opinion or were practicing medicine when the claim arose; (2) have knowledge of the acceptable medical standards in the diagnosis, care, or treatment of the condition involved in the claim; and (3) are qualified on the basis of training or experience to opine as an expert on those standards. *Id.* at 266; *see also* CIV. PRAC. & REM. § 74.351(r)(5)(A), § 74.401(a). Experts are qualified on the basis of training or experience, in turn, if they are (1) board certified or have other substantial training or experience in an area of medical practice relevant to the claim and (2) actively practicing medicine in rendering medical care relevant to the claim. *Thiel*, 296 S.W.3d at 266; *see also* CIV. PRAC. & REM. § 74.401(c).

In defining the statutory qualifications for a chapter 74 expert, the TMLA "does not focus on the defendant doctor's area of expertise but on the condition involved in the claim." *Thiel*, 296 S.W.3d at 267; *see* CIV. PRAC. & REM. § 74.401(a)(2). "[T]he applicable 'standard of care' and an expert's ability to opine on it are dictated by the medical condition involved in the claim and by the expert's familiarity and experience with it, not by the defendant doctor's area of expertise." *Thiel*, 296 S.W.3d at 267 (citing *McKowen v. Ragston*, 263 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (permitting infectious disease specialist to opine on standard of care applicable to cardiologist treating an infection); *Blan v. Ali*, 7 S.W.3d 741, 746–47 & n.3 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (permitting neurologist to opine on standard of care applicable to cardiologist and emergency room hospitalist where the condition—a stroke—fell within his particular expertise)).

"[I]f a subject of inquiry is substantially developed in more than one field, a qualified expert in *any* of those fields may testify." *Blan*, 7 S.W.3d at 745 (citing *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996)). And "if the subject matter is

common to and equally recognized and developed in all fields of practice, any physician familiar with the subject may testify as to the standard of care." *Id.* at 745–46 (citing *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (any familiar physician can opine on the process of infection); *Hersh v. Hendley*, 626 S.W.2d 151, 154–55 (Tex. App.—Fort Worth 1981, no writ) (it is basic medicine to obtain and document a patient's medical history and any familiar physician may opine to that effect); *Sears v. Cooper*, 574 S.W.2d 612, 615 (Tex. App.—Houston [14th Dist.] 1978, writ ref'd n.r.e.) (any familiar physician can opine on the use of a diuretic)).

> B. *Dr. Paine is qualified to opine on the standard of care applicable to Appellees because he has substantial familiarity and experience with the specific postoperative hysterectomy complication that afflicted Sylvia.*

In their first issue, Appellants assert that Dr. Paine was qualified to opine on the applicable standard of care. Doctors Ansari (and Permian defending against vicarious liability for the acts or omissions of Dr. Ansari), Asamoa, Bharti, Mocherla, and Orfaly each objected to Dr. Paine's qualifications to opine as an expert on the applicable standard of care. Doctors Asamoa, Bharti, and Orfaly are hospitalists. Dr. Ansari is a nephrologist. Dr. Mocherla is an infectious disease specialist.

Our review of Dr. Paine's CV reveals that he has been board certified as an Obstetrician-Gynecologist since 1977. He was licensed to practice medicine both when the alleged offenses occurred and when he prepared his expert report. At that time, he practiced obstetrics and gynecology as a staff member at the San Antonio Surgery Center in San Antonio, Texas. He was also an associate professor of obstetrics and gynecology at the University of Texas Health Science Center at San Antonio, where he lectured on the subjects of obstetrics and gynecology and ran a didactic lecture series for medical residents. He was also an active member of the

19

American Association of Gynecologic Laparoscopists, the Texas Association of Obstetrics and Gynecology, the San Antonio Ob/Gyn Society, and the American College of Obstetrics and Gynecology.

Sylvia's complications resulted from infection related to a recent hysterectomy. In his expert reports, Dr. Paine states that he has extensive experience in the postoperative management of patients who undergo laparoscopic hysterectomy, the procedure at the heart of this case. Such postoperative care, he explains, "includes following the patient after the surgery is completed to diagnose and treat any complications that may arise from the surgical procedure." He asserts that this is an integral part of his practice and a typical part of the practice of an obstetrician-gynecologist. Dr. Paine's report and CV establish his familiarity with the common complications of hysterectomy surgery, including the ureteral injury sustained by Sylvia, and how to diagnose and treat such complications during the postoperative stage. Further, Dr. Paine asserts that he is knowledgeable of the accepted medical standards for the postoperative management and care of hysterectomy patients, like Sylvia, and that he is "qualified to render an expert medical opinion with regards to any complications arising from a hysterectomy."

Dr. Paine goes on to explain in his reports that:

At all times pertinent to this case, [Sylvia] had the same significant clinical presentation, namely, she was a patient who had recently undergone hysterectomy surgery, and she had an undiagnosed ureteral injury that came about because of that surgery. This was her condition when she presented to every one of the [Appellees] . . . .

Taking a medical history and considering factors such as recent surgeries in diagnosing the cause of a patient's symptoms is common to virtually all physicians. Any physician should be capable of conducting a differential diagnosis and considering whether a recent surgery could be a contributing cause of the patient's current symptoms. This applies whether the physician sees the patient in the emergency room, in the hospital, in a clinic setting, or in a private office

20

examination room. Taking and considering a medical history—in particular, a history of recent surgeries—and accounting for significant symptoms like an elevated white blood count is basic medicine.

Appellees, in their motions to dismiss, objected to Dr. Paine's qualifications on the same grounds: that his area of medical specialization is not the same as their areas of medical specialization. This argument ignores the case law we have cited in the opinion and Dr. Paine's experience in the postoperative management and care of hysterectomy patients. The relevant consideration in determining an expert's qualification is their "familiarity and experience with" "the medical condition involved in the claim," not their respective titles or specializations. *Thiel*, 296 S.W.3d at 267 (citing *McKowen*, 263 S.W.3d at 162; *Blan*, 7 S.W.3d at 746–67 & n.3). Dr. Paine demonstrates, in his CV and expert reports, that he is qualified because of his familiarity, knowledge, training, and experience with managing and caring for hysterectomy patients and with diagnosing postoperative complications that commonly afflict them. Sylvia sustained a ureteral injury during a hysterectomy surgery, a complication with which Dr. Paine indicates that he is familiar based on his training and experience as a practicing obstetrician-gynecologist and professor of obstetrics and gynecology, and thus a complication which he is amply qualified to diagnose and treat. Dr. Paine's report adequately addresses his qualification to opine about the standard of care applicable to the care and management of a post-operative hysterectomy patient suffering from an injured ureter. As our sister court in Houston has explained:

> The appellees/doctors' argument that Dr. [Paine] is unqualified to give an opinion because he does not know the standard of care applicable to [their areas of specialization] would be persuasive, if not determinative, *if* Dr. [Paine] were purporting to offer expert medical opinions in matters peculiar to the[ir] fields . . . . *He is not*. Dr. [Paine] seeks to offer expert testimony about matters clearly within his knowledge. . . . Dr. [Paine] is not precluded from giving an opinion . . . where the

21

subject of the claim ([diagnosis of postoperative complications after a hysterectomy]) falls squarely within his medical expertise . . . .

*Blan*, 7 S.W.3d at 746.

Dr. Asamoa, Dr. Bharti, and Dr. Orfaly—all of whom are hospitalists—argue that an Obstetrician-Gynecologist like Dr. Paine necessarily has a *narrower* focus than generalists such as themselves and that the same standard of care applicable to his specialization should not apply to them. In other words, rather than arguing that Dr. Paine is not qualified to opine on the standards of care unique to hospitalists, they argue that Dr. Paine cannot impose a standard of care unique to his specialty of obstetrics-gynecology on physicians of a different specialty. Dr. Paine, however, does not opine that these physicians should have abided by a standard of care specific to the field of obstetrics and gynecology but, rather, that they should have conducted an adequate differential diagnosis that considered Sylvia's recent hysterectomy and the symptoms that are commonly seen in patients who have recently undergone surgery. *See Pacha v. Casey*, No. 14-07-00150-CV, 2008 WL 2837560, at *6 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (mem. op.) (holding that a cardiologist could opine on standard of care applicable to a gastroenterologist regarding proper care for a patient experiencing cardiac symptoms that "are basic to the general practice of medicine"). A differential diagnosis that takes into consideration a patient's medical history, including recent surgery, is not a novel or ultra-specialized standard of care. *See, e.g.*, *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 216–17 (Tex. 2010) (describing differential diagnosis as "a routine diagnostic method used in internal medicine," which "enjoys widespread acceptance in the medical community"); *Thiel*, 296 S.W.3d at 267 (holding that an emergency room physician could opine that general family practice doctor failed to conduct an adequate differential diagnosis in treating patient with appendicitis).

22

We hold that Dr. Paine is qualified to opine on the post-hysterectomy/surgery standard of care applicable to Doctors Ansari, Asamoa, Bharti, Mocherla, and Orfaly. Therefore, we sustain Appellants' first issue on appeal.

### C. *Dr. Paine's expert reports sufficiently articulate a standard of care and how Appellees breached it.*

In their second issue, Appellants assert that Dr. Paine's expert reports sufficiently stated the standard of care and explained how Appellees breached that standard. Doctors Ansari (and Permian), McKenna, and Mocherla each asserted in their motions to dismiss that Dr. Paine failed to articulate a standard of care—or the manner in which they breached an applicable standard of care—that satisfies the TMLA's requirement that the expert report provide each defendant physician with notice of what they should have done differently. We agree with Appellants.

An expert's articulation of the applicable standard of care, and how the defendant physicians breached it, is sufficient so long as it informs each defendant of the specific conduct called into question and provides a basis for the reviewing court to conclude that the claims have merit. *Baty*, 543 S.W.3d at 693–94; *Palacios*, 46 S.W.3d at 879. Indeed, the Texas Supreme Court recently held that at "this preliminary stage, whether those standards appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort." *Abshire*, 563 S.W.3d at 226 (quoting *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 516–17 (Tex. 2017)). To provide a fair summary of the standard of care and breach, the report is sufficient if it sets forth "specific information about what the defendant should have done differently." *Id.* (quoting *Palacios*, 46 S.W.3d at 880). So long as Dr. Paine spelled out "what care was expected, but not given[,]" then he provided Appellees with a fair summary of the standard of care and how he claims that the care they provided fell below that standard. *Id.* (quoting *Palacios*, 46 S.W.3d at 880).

Facts differ somewhat with respect to Dr. McKenna. Dr. Paine states in his first supplemental report that, on January 31, 2018, Dr. McKenna "noted right side hydronephrosis—a swelling of the kidney due to build-up of urine—as well as ascites (an abnormal build-up of fluid in the abdomen), pleural effusions, and dependent atelectasis (a collapse of lung tissue)." Dr. Paine opines that the standard of care under these circumstances "required Dr. McKenna to consider post-surgical complications as a part of the differential diagnosis." Dr. Paine identified concrete measures called for by the standard of care, including conducting a serum creatine test or CT nephrogram, which would have revealed how well the kidney was draining into the ureters and bladder and which would have demonstrated Sylvia's surgery-related injury. Thus, Dr. Paine opines, Dr. McKenna breached the standard of care by failing to conduct a complete differential diagnosis that accounted for her recent surgery and for his attendant failure to order any of the aforementioned tests to assess Sylvia's kidney function.

In his second supplemental report, Dr. Paine explains that the standard of care required Dr. McKenna "to consider [Sylvia's] high white blood count and post-surgical status in his differential diagnosis." Dr. Paine further states that "the hydronephrosis and build-up of fluid in Sylvia's abdomen should have prompted Dr. McKenna to examine how well the kidney was draining." Again, Dr. Paine explains that this could have been done by ordering a CT nephrogram, which Dr. McKenna failed to do.

As required, Dr. Paine's report spells out steps which Dr. McKenna should have, but failed to take. The report explains that the standard of care required Dr. McKenna to consider postoperative complications as a possibility until ruled out, and the report identifies specific, concrete diagnostic tests that Dr. McKenna should have used in order to rule out a surgical injury before proceeding with alternative theories of Sylvia's pathology. "The ultimate evidentiary value of the opinions

24

proffered by Dr. [Paine] . . . is a matter to be determined at summary judgment and beyond[,]" but at the very least, Dr. Paine's report gives notice to Dr. McKenna as to the specific conduct that Appellants called into question and provides a basis for the trial court to conclude that the claims have some merit. *Abshire*, 563 S.W.3d at 226. Thus, Appellants' expert reports adequately articulated a standard of care applicable to Dr. McKenna and the manner in which the care he rendered fell below that standard.

We reach the same result as to Dr. Mocherla. Dr. Mocherla saw Sylvia on several occasions in February 2018, prescribing antibiotics and antifungals to treat Sylvia's infections. However, according to Dr. Paine, "the standard of care called for Dr. Mocherla not to just treat the signs of infection as symptoms or as singular infections . . . but to also consider [Sylvia's] status as a post-operative patient and consider post-operative complications as a source of her persistent infection." The standard of care, Dr. Paine continues, "obliged him to consider the surgery as a possible factor that was contributing to or causing infection" "and, if necessary, [to] consult[] a physician knowledgeable about the potential complications of hysterectomy surgery." Thus, Dr. Paine set forth the care expected of Dr. Mocherla, which Dr. Mocherla failed to provide. Namely, he opines that Dr. Mocherla should have considered postoperative complications as a possible source of Sylvia's symptoms until that had been ruled out through the process of differential diagnosis. Dr. Paine asserts that Dr. Mocherla breached this standard of care because he never "considered iatrogenic injury in his differential diagnosis in order to identify the origin of infection." Dr. Paine also identifies a concrete step that Dr. Mocherla should have taken, namely, consulting a physician who might know more about common complications associated with postoperative hysterectomy patients.

Again, at this gate-keeping stage, it is not the trial court's role to weigh the report's credibility but, rather, to ensure that the only claims that are allowed to

proceed are accompanied by expert reports that inform the defendant physicians of what care was expected of them and what they failed to provide. Dr. Paine's report adequately apprised Dr. Mocherla of what care was expected of him that he failed to provide. As such, Appellants' expert report adequately articulated an applicable standard of care as to Dr. Mocherla and the manner in which he is alleged to have breached it.

Further, we reach the same result as to Dr. Ansari (and Permian). According to Dr. Paine, Dr. Ansari consulted with Sylvia on January 31 and mistakenly reported that she "had a partial hysterectomy done and recovered well from this about one month ago." Sylvia actually had a *total* laparoscopic hysterectomy only *two weeks* before Dr. Ansari saw her. Moreover, she had *not* recovered well insofar as it was an injury from that surgery that caused her to endure hydronephrosis and other complications. Dr. Ansari, a kidney specialist, "failed to note the findings on the admission CT scan which found: 'Mild right sided hydronephrosis[,]'" an affliction of the kidneys. Moreover, Dr. Paine opines that Dr. Ansari "did not attempt to account for [Sylvia's] significantly elevated white blood count and connect it to her other symptoms and immediate surgical history." Ultimately, Dr. Paine opines that Dr. Ansari failed to consider "the possibility of surgical injury as an explanation for her symptoms, and he did not take this into account in his differential diagnosis." Dr. Paine states that, under the standard of care applicable to Dr. Ansari, his "differential list should definitely have included postoperative complications from surgery, including a potential urinary tract injury."

Whether Dr. Paine is ultimately correct as to what was required of Dr. Ansari, and whether the care he provided was inadequate, is an improper inquiry at this gate-keeping stage. *See Abshire*, 563 S.W.3d at 226. What matters is whether the opinions in Dr. Paine's report gave Dr. Ansari notice as to the conduct Appellants are calling into question and what, according to Appellants, Dr. Ansari should have

done differently. It is apparent from Dr. Paine's reports that Appellants are questioning Dr. Ansari's failure to perform a differential diagnosis by preemptively ruling out surgical complication as a potential cause of Sylvia's pathology without performing any tests to justify doing so. It is apparent from Dr. Paine's reports that Appellants allege that Dr. Ansari should have conducted a differential diagnosis that took into account Sylvia's recent surgery but that Dr. Ansari failed to do so. Appellants' expert reports adequately articulated an applicable standard of care as to Dr. Ansari and the manner in which he is alleged to have breached it. Whether Appellants' account of events will carry the day at summary judgment or beyond is unknown. But at this early stage, the expert report satisfies the TMLA's requirements because it provides a fair summary as to the applicable standard of care and how it was breached. Therefore, we sustain Appellants' second issue on appeal.

D. *Dr. Paine's expert reports sufficiently explain, factually, how he claims the failure by Appellees to conduct an adequate differential diagnosis proximately caused Appellants' injuries.*

Finally, in their third issue, Appellants assert that Dr. Paine's reports sufficiently stated causation. Doctors Ansari (and Permian), Asamoa, McKenna, and Mocherla each argued, in their motions to dismiss, that Dr. Paine's expert reports were deficient for failure to sufficiently explain *how* their respective failures to conduct a complete differential diagnosis *caused* Appellants' injuries. Dr. McKenna argued that Dr. Paine's opinions on causation were conclusory and did not explain how Dr. McKenna's alleged breach "caused or worsened [Sylvia's] injuries." Similarly, Dr. Mocherla argued that Dr. Paine's report failed to explain how the "failure to consider the status of a post-operative patient and post-operative complications" "caused, worsened, or accelerated [Sylvia's] injur[ies]." Dr. Ansari and Permian simply asserted that "Dr. Paine's report clearly . . . fails to provide a causal nexus between [Dr. Ansari's alleged breach] and [Appellants'] alleged injur[ies]." Dr. Asamoa, on the other hand, argued that Dr. Paine's reports "lump[]

27

all Defendants together arguing that they globally failed to 'perform a complete differential diagnosis' . . . . However, Dr. Paine does not explain . . . how specific actions or inactions of Dr. Asamoa were a proximate cause of the harm." We disagree.

At this stage, all that is required is "a good-faith effort to explain, factually, how proximate cause is going to be proven." *Abshire*, 63 S.W.3d at 224 (quoting *Zamarripa*, 526 S.W.3d at 460). Such an explanation is sufficient if it provides "a straightforward link" between the alleged breach of the standard of care and the complainant's injuries. *Id.* at 225. Thus, for our purposes, Dr. Paine's reports are adequate so long as they "draw[] a line directly from [Appellees'] failure [to conduct a complete differential diagnosis] . . . to a delay in diagnosis and proper treatment . . . to the ultimate injury." *Id.* Dr. Paine's report is clear that as to each Appellee, *the delay* in diagnosis is the direct and proximate cause of injury. "*Whether this explanation is believable should be litigated at a later stage of the proceedings.*" *Id.* at 226 (emphasis added).

Our review of Dr. Paine's reports reveals a straightforward and direct link of the alleged failures of each Appellee to conduct a differential diagnosis to a delay in the diagnosis and proper treatment of Sylvia's ureteral injury. Dr. Paine's reports set forth how each Appellee had the opportunity but failed to include in a differential diagnosis the possible complications from Sylvia's recent hysterectomy and then to pursue a methodical investigation and elimination of each. Appellees' failures to consider postoperative complications as a possibility to include in a complete differential diagnosis resulted in their failure to test for a ureteral injury by ordering a CT nephrogram with contrast, which "would have demonstrated that a right ureteral injury was present and the cause of all of [Sylvia's] pathology." This resulted in a delay in the proper treatment and progressive deterioration of the patient. Upon the discovery of Sylvia's ureteral injury, "[a] percutaneous

28

nephrostomy could have been placed, and [Sylvia's] [complications] would have been completely avoided." These failures, Dr. Paine concludes, were "the direct cause of six weeks of hospitalization, continued pain, sickness, and unnecessary interventions." Dr. Paine's reports do directly link his claims of Appellees' failures to conduct a differential diagnosis to a delay in diagnosis and proper treatment and therefore to Appellants' ultimate injuries. The delay in doing what was necessary to arrive at an accurate diagnosis and to deliver proper treatment prolonged pain and suffering and resulted in continued deterioration; when Sylvia's injury was extended, it was at least in some measure "worsened." No more is required at this stage.

Contrary to Dr. Asamoa's objections, Appellants were not required to finely partition liability and single out the specific contribution to the injuries that Dr. Asamoa's failure to conduct a differential diagnosis uniquely made—as separate and distinct from the contributions made by the other Appellees' identical failures to conduct a differential diagnosis. *See San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 817 (Tex. App.—Houston [14th Dist.] 2008, no pet.) ("That he held each defendant to the same standard of care, found the same type of breach, and analyzed causation in the same way does not render his opinion inadequate."). Indeed, at this early stage of the proceedings before discovery has even been conducted, it would be unreasonable to expect the same degree of precision that might be expected at summary judgment or at trial. Moreover, as the Texas Supreme Court has expressly stated, "at this stage we do not require a claimant to 'present evidence in the report as if it were actually litigating the merits.'" *Abshire*, 563 S.W.3d at 226 (quoting *Palacios*, 46 S.W.3d at 879). The degree of precision to which Dr. Asamoa claims she is entitled is beyond the scope of what is minimally required of Appellants at this early stage.

For these reasons, we hold that Dr. Paine's expert reports constitute an objective, good faith effort to comply with the TMLA's requirement to provide a fair summary of his opinion on the causal relationship between Appellees' breaches of the applicable standard of care and Appellants' injuries. *See* CIV. PRAC. & REM. § 74.351(*l*), (r)(6). Accordingly, we sustain Appellants' third issue.

## *This Court's Ruling*

We reverse and render in part, and we reverse and remand in part. With respect to the trial court's denial, in part, of TTUHSC's motion to dismiss, Appellants had a full and fair opportunity to amend and plead sufficient facts of any alleged waiver of sovereign immunity; therefore, we reverse the trial court's order and we render a judgment of dismissal with prejudice as to Appellants' claims against TTUHSC for lack of subject-matter jurisdiction. With respect to the trial court's grant of the remaining Appellees' motions to dismiss on various grounds regarding the adequacy of Appellants' expert reports, we reverse and remand. Because these reports constitute an objective, good faith effort to comply with the TMLA's requirement to provide a fair summary as to the applicable standards of care, breach, and causation, we hold that the trial court abused its discretion in dismissing Appellants' claims and causes of action against the remaining Appellees. Accordingly, we reverse the trial court's order insofar as it dismissed Appellants' claims against Permian Premier Health Services and Doctors Asamoa, Mckenna, Mocherla, Orfaly, Ansari, and Bharti, and we remand those claims to the trial court for further proceedings consistent with this opinion.


May 12, 2022                  W. BRUCE WILLIAMS

Panel consists of: Bailey, C.J.,      JUSTICE
Trotter, J., and Williams, J.